TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-95-00681-CR






Eric Kahmann, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. 95-0101, HONORABLE MIKE LYNCH, JUDGE PRESIDING






PER CURIAM 

 A jury convicted Eric Kahmann of indecency with a child by contact but acquitted him of
aggravated sexual assault. The court assessed sentence at twelve years in prison. He complains on appeal
about the trial court allowing the prosecutor to withhold evidence, call more than one outcry witness, use
the child's videotaped testimony, and fail to correct a false statement by the complainant. He also
complains that the evidence was factually insufficient to support the verdict. We will affirm the judgment.

 We begin with a brief overview of the evidence. The State's witnesses presented a story
of repeated incidents during which Eric Kahmann would touch or lick the nine-year-old complainant's
genitals and get her to touch his genitals. Katherine, the complainant's mother, testified that the incidents
must have occurred between March and July 1992 when her sister was babysitting the complainant and
the defendant lived nearby. The defense presented several witnesses who vouched that they trusted the
defendant around their children, some witnesses who questioned the complainant's character and
credibility, and a physician who stated that the complainant's description of her abuser's pubic region (dark
hair and no scars on his thigh) differed from the defendant's actual appearance (reddish-blond hair and a
scar on his thigh). The jury rejected the testimony regarding oral-genital contact and acquitted the
defendant of aggravated sexual assault. Supported by testimony of other genital contact, the jury convicted
Kahmann of indecency with a child by contact.

 By point of error one, Kahmann complains that the court should have granted him a new
trial because the prosecutor's failure to show him Katherine's statement before trial deprived him of his
constitutional right to due process and due course of law. (1) He contends he first learned at trial that
Katherine had told police that she believed the abuse must have occurred between March and July 1992
rather than on August 1, 1991, the date in the indictment. Kahmann argued that, had he seen a copy of
her statement before trial, he would have focused his defense on his alibi for that time period--he said he
was in jail for much of 1992 and 1993. The State contends that it showed defense counsel the statement
as part of the police report, though the prosecutor could not remember which of two formats of the report
he had been shown. The defense attorney contended that he saw only an edited version of the police
report, saw neither of the reports the prosecutor claimed to have shown him, and did not see Katherine's
statement. He testified that the absence of critical details from his notes proved that he did not review
Katherine's statement. The defendant testified at the hearing on the motion for new trial that his attorney
was really surprised at trial when given Katherine's statement. The trial court overruled the motion for new
trial by operation of law by not ruling within seventy-five days of the judgment. Because the court did not
expressly rule, it did not state a basis for its refusal to grant the motion.

 When reviewing a ruling on a motion for new trial, we will reverse only for an abuse of
discretion. State v. Gonzales, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993). An abuse of discretion
occurs when the trial court applies an erroneous legal standard or when no reasonable view of the record
supports the trial court's conclusion under the correct law. Dubose v. State, 915 S.W.2d 493, 498 (Tex.
Crim. App. 1996). Because the trial court was in a position to evaluate the credibility of the witnesses, we
view the testimony at the hearing on the motion for new trial in the light most favorable to the court's ruling. 
Cantu v. State, 930 S.W.2d 594, 595 (Tex. Crim. App. 1996). The State violates the due process rights
of the defendant when it withholds material information favorable to the defense. Kyles v. Whitley, 131
L. Ed. 490, 505 (1995). To prove the withheld evidence was material, the defense must show a
reasonable probability that introducing the evidence would have produced a different result at trial. Id. at
508. Any withholding of evidence that undermines confidence in the outcome of the trial indicates a
reasonable probability that the result would have been different with the evidence. Id. If the defense meets
this burden, we must presume harm and reverse the judgment. Id.

 We conclude that the court did not err by overruling the motion for new trial. The court
reasonably could have concluded from the evidence that the State showed the defense attorney Katherine's
statement as part of the police report. Alternatively, the court could have concluded that the defense failed
to prove that the evidence was material. Kahmann testified only that he was in jail a lot during 1992; he
did not testify that he was jailed throughout the March-July 1992 period when Katherine testified the abuse
occurred. The trial court reasonably could have concluded that the defendant's failure to prove that he was
incarcerated during the entire period precluded him from showing a reasonable probability of a different
result. We overrule point one.

 By point of error two, Kahmann contends that the trial court erred by allowing two outcry
witnesses to testify at trial. An outcry witness is the first adult, other than the defendant, to whom a preteen
victim makes a statement about the offense. Tex. Code Crim. Proc. Ann. art. 38.072, § 2 (West Supp.
1997). The statement must be more than words that make a general allusion to child abuse. Garcia v.
State, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). The State designated as outcry witnesses the
complainant's teacher, the complainant's school counselor, Katherine, and the police department's victim
services supervisor. Appellant contends that the State's designation of multiple outcry witnesses deprived
him of the required statutory notice of who the outcry witness would be. He also contends that the statute
allows for only one outcry witness. We will not disturb the court's decision on the allowance of outcry
witnesses absent an abuse of discretion. Id.

 We conclude that the State complied with the notice requirement. The statute states that
a party can offer an outcry witness if:


on or before the 14th day before the date the proceeding begins, the party intending to
offer the statement:


(A) notifies the adverse party of its intention to do so;


(B) provides the adverse party with the name of the witness through whom it intends to
offer the statement; and 


(C) provides the adverse party with a written summary of the statement.



Tex. Code Crim. Pro. Ann. art. 38.072, § 2(b). The State's amended notice of intent to call the outcry
witnesses was filed almost four months before trial and contained summaries of the outcry made to the four
witnesses. The court allowed the second and third listed witnesses to testify regarding the outcry.

 The issue is whether the presence of the other two witnesses not called rendered the notice
useless regarding the witnesses called. Kahmann complains that he could not tell which witness was the
first the complainant told and which witness the State intended to call. The sequence of the first three
witnesses is not apparent from the face of the document. (The summary showed the complainant spoke
to the fourth witness two weeks after she spoke to the first three witnesses.) The State hoped to call all
four witnesses to show a multi-stage continuous outcry, but the court opined that all stages of the outcry
had to be made to a single person. The State further contended that it listed multiple witnesses because
it was concerned that the court might disallow a witness because the outcry was incomplete. See Garcia,
792 S.W.2d at 91. The wisdom of that strategy was borne out by the court's decision to disallow the first
listed witness's testimony because the outcry was too vague. Because it had listed more than one witness,
the State was permitted to call the second and third witnesses because Kahmann had timely notice of their
names and the nature of their testimony.

 The court did not err in disallowing the teacher as the sole outcry witness. The teacher was
the first adult to whom the complainant mentioned sexual abuse. The complainant told her she had been
raped and that the abuser, who was not her father, "went inside her." The teacher immediately sent the
complainant to the school counselor. The teacher did not know who the abuser was, when the abuse
occurred, nor how the abuser "went inside" the complainant. The court ruled that the child's statements
to her teacher were too vague to qualify as outcry. The child in this case revealed less to her teacher than
the child in Garcia who talked for fifteen minutes and "wanted to talk about it practically all day" before
her teacher sent her to the counselor. The court of criminal appeals held in Garcia that the trial court did
not err by holding that the teacher was not an outcry witness because the record lacked relation of specific
details of the offense. 792 S.W.2d at 91-92. We hold that the trial court did not abuse its discretion by
concluding that the teacher's testimony did not have the requisite specificity to qualify as an outcry.

 Nor did the court err by allowing both the complainant's school counselor and Katherine
to testify as the outcry witnesses. Because the statute designates as the outcry witness the first adult to
whom the child speaks about an offense, only one person can be an outcry witness. See Tex. Code Crim.
Proc. Ann. art. 38.072, § 2(a). The statute does not address what happens when the child makes outcries
about different offenses to different people. The logical deduction is that the first person to whom outcry
is made for each offense can testify. The complainant told the counselor that Kahmann made her perform
oral sex on him; the teacher could not remember if the child had used those words or if she interpreted the
child's words as describing oral sex. Though the counselor's testimony regarding what the child told her
was not very detailed, we cannot say that the court abused its discretion by terming her the outcry witness
for aggravated sexual assault. The child also told Katherine that appellant made her kiss his penis, but
further told her that she and Kahmann touched each other's genitals. The trial court allowed the counselor
to testify as the aggravated-sexual-assault outcry witness and Katherine to testify as the indecency-with-a-child outcry witness. We reject the contention that Katherine should have been the only outcry witness
because she could testify as to both offenses. Once the court determined that the counselor was the first
person to whom the child made outcry regarding aggravated sexual assault, the primacy requirement
precluded any other witness from being the first regarding that offense. Because of the limited nature of
her initial outcry, the court did not abuse its discretion by allowing different outcry witnesses for different
offenses. We overrule point two.

 By points of error three and four, Kahmann complains that the introduction of the child's
videotaped statement violated his federal and state constitutional rights to confrontation, cross-examination,
due process, and due course of law. Kahmann complains that the State did not comply with the statutory
safeguards for his rights or, alternatively, that the safeguards as applied failed to protect his rights. See Tex.
Code Crim. Proc. Ann. art. 38.071. He complains that the testimony on the video is not reliable because
the child did not take an oath and was not cross-examined. He complains that the State failed to show that
the video was necessary, particularly in light of her live testimony. He complains finally that the showing
of the video after the complainant's live testimony unfairly bolstered the State's case, rendering the trial
fundamentally unfair.

 Kahmann appears to concede that the State complied with the statute in the making of the
video. The child, though not under oath, was admonished to tell the truth. He does not argue that the State
missed any of the other predicate items required under article 38.071, § 5 to prove the admissibility of a
pre-indictment video of the complainant.

 In his constitutional argument, however, he contends that she was not unavailable; article
38.071, § 1 requires the court to find that the child is unavailable before admitting the video. He argues
that her live testimony shows she was available and not traumatized by testifying. The statute allows the
court to determine that a witness who was available has become unavailable. Tex. Code Crim. Proc. Ann.
art. 38.071, § 8(b). Possible trauma can be considered, but is not required, to show unavailability. Id.,
§ 8(a). Among the factors that the court can consider in making the determination is the time elapsed since
the alleged offense. Id. The trial occurred more than three years after the offense, almost a year after the
video was made. The court was persuaded that the child's lack of memory regarding aspects of the
offenses made her unavailable to testify regarding them. The court could have concluded that the time lapse
contributed to the child's loss of memory and that the memory loss rendered her unavailable to testify as
to the aggravated sexual assault. The trial court did not abuse its discretion in finding that the child was
unavailable within the meaning of article 38.071.

 Kahmann contends that his constitutional rights to confrontation and cross-examination
nevertheless were violated. He correctly notes that admission of evidence under a hearsay exception can
meet the statutory requirements and yet violate the right to confrontation. See Holland v. State, 802
S.W.2d 696, 699 (Tex. Crim. App. 1991). That court laid out a blueprint for admission that the State
followed here. That court held that, when offering out-of-court statements and faced with confrontation
and due process/due course of law objections, the State can either call the witness itself or make a showing
of the reliability and necessity of using the out-of-court statement. Id. at 700. Only when full and fair
cross-examination of the child at trial is impossible does the State have to show the necessity and reliability
of the out-of-court statements to satisfy the confrontation clause. See Briggs v. State, 789 S.W.2d 918,
922 (Tex. Crim. App. 1990) (quoting Buckley v. State, 786 S.W.2d 357, 360 (Tex. Crim. App. 1990)). (2) 
The Holland court stated, "If the State follows either of these two courses, the accused's objection on
confrontation grounds should be overruled." 802 S.W.2d at 700.

 In this case, the State had already called the complainant and Kahmann had cross-examined her; both parties queried her on discrepancies between her trial testimony and statements on the
video before the video was offered. Kahmann contends that cross-examination of the complainant as to
any information on the video that was not in her live testimony would have been fruitless because she
claimed no memory of the testimony for which the video was introduced. He essentially argued that the
only time he could have effectively cross-examined her was at the time of the video, when no charges were
pending against his client. Kahmann ignores the statutory provision allowing him, once charges were filed,
to propound written questions for the video interrogator to ask the complainant during a subsequent video. 
Tex. Code Crim. Proc. Ann. art. 38.071, § 2(b). The subsequent video must be shown along with the
original video. Id., § 2(c)). Apparently, Kahmann did not take advantage of this opportunity because no
subsequent video was offered and no objection arose to its absence. Because he was not denied the right
to full and effective cross-examination, we need not address whether the State showed the necessity and
reliability of the video independent of the statutory requirements. Kahmann was not denied his right to
confront or cross-examine the complainant.

 Nor did presentation of both the complainant's live testimony and the video violate
Kahmann's rights to due process and due course of law. Not every instance in which the State presents
a witness live and on video will violate the accused's guarantees of due process and due course of law. 
Briggs, 789 S.W.2d at 923. The video was not purely repetitive of the live testimony. The video repeated
the basic outline of the child's charges that Kahmann had her caress his penis in the television room. But
the child's statement on video that Kahmann touched, licked, and poked her privates was the only evidence
of Kahmann contacting the child's sexual organ; as such, it was the only unequivocal evidence of
aggravated sexual assault (contrasting with the counselor's uncertainty of whether the child told her she
performed oral sex or if the counselor surmised that from the child's statement). The video also showed
some discrepancies in the child's story as to where the abuse occurred--on the video, she said the TV
room only, but she told others he took her to his room--leaving some room for Kahmann to question the
child's credibility. We find no constitutional violations. We overrule points three and four.

 By point of error six, Kahmann complains that the State violated his right to due process
and due course of law when the prosecutor failed to correct a statement by the complainant that the
prosecutor should have known was false. The duty to correct is not merely an ethical responsibility but is
necessary to protect the accused's right to due process and due course of law. Duggan v. State, 778
S.W.2d 465, 468-69 (Tex. Crim. App. 1989). The prosecutor must correct not just false, but misleading
evidence as well. Id. The remedy for failure to correct is a new trial unless the evidence does not violate
the defendant's rights; the harmless error analysis of Texas Rule of Appellate Procedure 81(b)(2) applies. 
Id. at 469.

 Kahmann complains that the prosecutor should have corrected the complainant's denial
that she knew another man named Eric (Philippus) who looked similar to the defendant, was around the
complainant about the same time, and was investigated for molesting a child. Kahmann interrupted just
before the State had the complainant identify the defendant as her assailant, requesting to take the witness
on voir dire to query her about Philippus. The State objected when the defense started to show the
complainant a photograph of Philippus. The following exchange occurred when the court asked the State
to explain its objection:


THE COURT: You were just getting ready to have her identify the defendant sitting next
to the defense counsel as the only person in the courtroom. What's the difference?


[PROSECUTOR]: Well, this is somebody she knows. If it had been a stranger on a
stranger, she would have had--.


THE COURT: How do you know whether or not she knows this individual or not?


[PROSECUTOR]: She's told me about him. She's told me how she knows him.



Outside the presence of the jury, the complainant denied knowing anyone named Eric Philippus and said
she did not recognize him from a photograph defense counsel showed her. The prosecutor did not correct
the complainant's denials. The jury returned and the complainant identified appellant as her abuser. She
did not testify about Philippus in front of the jury.

 We conclude that the prosecutor's inaction did not deprive the appellant of his
constitutional rights. We are not persuaded by the State's argument on appeal that appellant, not Philippus,
was the "him" whom the prosecutor said the complainant knew. But accepting the proposition that the
prosecutor was asserting that the complainant knew Philippus does not prove a deprivation of defendant's
rights. First, the above-quoted exchange happened so shortly before the complainant's denials it certainly
alerted the trial judge that the prosecutor believed the complainant had told the prosecutor she knew
Philippus. Second, the statement may not have been false because the complainant may not have
remembered Philippus at trial; she had forgotten aspects of her allegations made on the video, so she may
also have forgotten someone she knew three years before. Third, the jury never heard the denial from the
complainant and so could not have been misled if it was a false denial. Fourth, other witnesses testified that
the complainant knew Philippus, so Katherine's denial that the complainant knew Philippus was amply
rebutted in front of the jury; the complainant's denial, if false, did not linger unchallenged. We overrule
point six.

 By point of error five, Kahmann contends that the evidence was factually insufficient to
support the judgment. We judge the sufficiency of the evidence against the jury charge. Jackson v. State,
898 S.W.2d 896, 898 (Tex. Crim. App. 1995); see Fisher v. State, 887 S.W.2d 49 (Tex. Crim. App.
1994). The court charged the jury that


[a] person commits the offense of Indecency with a Child by Contact if, with a child
younger than 17 years of age and not his spouse, whether the child is of the same or
opposite sex, he engages in sexual contact with the child.


III.



"Sexual contact" means any touching of the anus, breast, or any part of the genitals of
another person with intent to arouse or gratify the sexual desire of any person.



In a factual sufficiency review, we examine all the evidence and will reverse only if the verdict is so contrary
to the overwhelming weight of the evidence as to be clearly wrong and unjust. Clewis v. State, 922
S.W.2d 126, 129 (Tex. Crim. App. 1996); Stone v. State, 823 S.W.2d 375, 381 (Tex. App.--Austin
1992, pet. ref'd, untimely filed).

 The prosecution's evidence consisted largely of the complainant's testimony and the
testimony of those she told about the abuse. There was no physical evidence and no one other than the
participants saw the abuse occur. The complainant testified that Eric would come into her Aunt Sandy's
house, lie on the floor, pull down his pants, and tell her to touch his "private" with her hand. She described
his private as hard, wet, and hairy; the hair was dark and his thighs had no scars. After she touched his
private, he would go back outside and resume working on a car with his brothers, Luke and John. She
did not remember him doing anything else; she said she did not know what oral sex was. She said these
incidents occurred in the middle of the day on weekends or in the summer. When asked to explain the
contradiction between her statement to Katherine that the incidents occurred in Eric's room and her video
statement that they occurred in the TV room, she said they took place mostly in the TV room, but once or
twice in Eric's room. She testified that Eric lived in the house with her family and her aunt's family. She
said that she remembered more when she made the video, but that looking at the video had not refreshed
her memory. The complainant also testified that her Uncle Jimmy molested his young sister (her aunt) and
her.

 The school counselor testified that the complainant told her she had been forced to have
oral sex with a man named Eric living in her household; the counselor could not remember if the
complainant had said "oral sex" or if the counselor had interpreted the description as such. The
complainant also said the man had assaulted her and her aunt.

 Katherine said the complainant told her that Eric would make her kiss him, pull on his
"thing," and kiss his thing. She also told her that he would look at her bottom and touch her private. When
the complainant said that Eric hurt her, Katherine asked, "You mean Luke's brother?", with which the
complainant agreed. The complainant told Katherine that the abuse occurred when she stayed with her
Aunt Sandy while Katherine was at work. Katherine said that Eric never lived with them. She did not
remember anyone named Eric Philippus. She did not believe that her brother could have abused the
children because he had not been around them for several years.

 The remaining State's testimony included the complainant's statement on video, a counselor
who testified that the complainant told her the abuser's name was Eric, and another counselor who testified
that sexually abused children often do not report the abuse immediately because they are humiliated,
embarrassed, and blame themselves. Police detective John Romoser testified that the complainant did not
specify a date that the abuse occurred, and that he picked August 1, 1991 as his best guess as to when the
abuse occurred.

 Several witnesses testified regarding Eric Kahmann's good behavior around children. Mary
Bennett testified that she has known Kahmann for most of his life. He lived with Bennett and several of her
children and grandchildren. Bobby Glawson and his children also lived with Bennett while Kahmann lived
there. Glawson testified that Kahmann slept on the living room floor with him and his children. Luke
Kahmann testified that his brother, Eric, lived next door, but never with him and the complainant. Bennett,
Glawson, Luke Kahmann, Rick Harper, Mary Hale, and Jack Hale, Jr. agreed that Eric Kahmann behaves
well around children and had no problem with him being around their children.

 Other witnesses agreed with their assessment, and contrasted it with Eric Philippus's
questionable reputation. Michelle Wharton, Philippus's estranged wife testified that the two Erics lived next
door to--but never with--Luke, Sandy, Katherine, and the complainant. She said that Philippus, whose
hair, build, and face resembled that of Eric Kahmann, was investigated for sexually abusing her daughter. 
Cindy Day testified that she lived behind Sandy and Luke Kahmann while Eric Kahmann lived next door. 
Day testified that she did not like her child playing with the complainant because the complainant used dolls
to simulate sex in front of her three-year-old daughter. The complainant also got the younger girls to go
behind a storage shed, take off their clothes, and urinate and defecate there. Day felt comfortable with her
children around Eric Kahmann, but not around Eric Philippus. Day's daughter testified that she also feels
comfortable around Kahmann. She does not like the complainant, opining that she is not a truthful person. 
Lisa Lambert said that Katherine not only knew but dated Eric Philippus in 1991, around the same time
she was dating Eric Kahmann.

 Dr. Constance Hanna testified that Eric Kahmann had a white scar on his left thigh that was
about an inch-and-a-half long and a quarter-inch wide; the scar is not easy to recognize, however. His
pubic hair is very light gold blond with a reddish tint. She allowed Kahmann to stay with her and her
children for a while during the pendency of the case; she said he is welcome in her home.

 Eric Kahmann denied committing any of the various forms of sexual assault and contact of
which the complainant accused him. He denied touching her genitals, having her touch his, or pulling his
pants down in front of her. He first learned of the accusations during a custody battle between his brother
Luke and Sandy. In August 1991, while he lived next to Luke, Eric Philippus lived with him. Kahmann
never lived with Luke, Sandy, and Katherine, but did sleep over three times when dating Katherine. He
said he was never alone with the complainant. He was not living next door to Luke in the summer of 1992,
but had moved in with Ms. Bennett. He said he saw Katherine and the complainant only a couple of days
in 1992 when, at Katherine's request, he worked on her car. He recalled seeing Harry Bush, then
Katherine's boyfriend, hit her, and theorized the complainant might be thinking of Bush instead of him. He
bore no animosity toward Katherine and the complainant and could not think why they should bear any
toward him.

 We conclude that factually sufficient evidence supports the judgment. There are some
inconsistencies in the testimony, but support for all the elements exists. The complainant consistently
testified to acts that would constitute indecency with a child by contact. The complainant's testimony that
the abuser's pubic hair was "dark" does not require acquittal absent some sort of context; it does not
support Kahmann's attempt to inculpate Eric Philippus. Kahmann's own testimony corroborates that he
was working on a car near the house during the relevant time in 1992. We cannot substitute our judgment
for the jury's decision. Based on the record before us, we cannot say that the jury's decision was so
against the overwhelming weight of the evidence as to be clearly wrong or unjust. We overrule point five.

 We affirm the judgment.


Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: June 5, 1997

Do Not Publish

1. Kahmann raises claims under both the federal and state constitutions. Though the provisions are
similar, they are not necessarily coextensive. Graham v. Texas Bd. of Pardons and Paroles, 913
S.W.2d 745, 751 (Tex. App.--Austin 1996, writ dism'd w.o.j.). Because Kahmann does not brief them
separately or point to different proof for each, we will treat the state claims as coextensive with the federal
claims. See Arnold v. State, 873 S.W.2d 27, 33 n.4 (Tex. Crim. App. 1993); see also Turner v. State,
886 S.W.2d 859, 862 (Tex. App.--Beaumont 1994, pet. ref'd).
2. The Briggs court was interpreting a predecessor of the current section 38.071. The old provisions
required the child be available in order to admit the video rather than the current statute's requirement that
the child be unavailable. Compare Briggs, 789 S.W.2d at 922 with Tex. Code Crim. Proc. Ann. art.
38.071. The complainant's appearance in this case moots the difference. The Buckley court was
interpreting the provisions allowing outcry witnesses. The constitutional issues are sufficiently analogous,
with the outcry witness serving as a conduit like the video camera for the complainant's out-of-court
statements.


Kahmann while Eric Kahmann lived next door. 
Day testified that she did not like her child playing with the complainant because the complainant used dolls
to simulate sex in front of her three-year-old daughter. The complainant also got the younger girls to go
behind a storage shed, take off their clothes, and urinate and defecate there. Day felt comfortable with her
children around Eric Kahmann, but not around Eric Philippus. Day's daughter testified that she also feels
comfortable around Kahmann. She does not like the complainant, opining that she is not a truthful person. 
Lisa Lambert said that Katherine not only knew but dated Eric Philippus in 1991, around the same time
she was dating Eric Kahmann.

 Dr. Constance Hanna testified that Eric Kahmann had a white scar on his left thigh that was
about an inch-and-a-half long and a quarter-inch wide; the scar is not easy to recognize, however. His
pubic hair is very light gold blond with a reddish tint. She allowed Kahmann to stay with her and her
children for a while during the pendency of the case; she said he is welcome in her home.

 Eric Kahmann denied committing any of the various forms of sexual assault and contact of
which the complainant accused him. He denied touching her genitals, having her touch his, or pulling his
pants down in front of her. He first learned of the accusations during a custody battle between his brother
Luke and Sandy. In August 1991, while he lived next to Luke, Eric Philippus lived with him. Kahmann
never lived with Luke, Sandy, and Katherine, but did sleep over three times when dating Katherine. He
said he was never alone with the complainant. He was not living next door to Luke in the summer of 1992,
but had moved in with Ms. Bennett. He said he saw Katherine and the complainant only a couple of days
in 1992 when, at Katherine's request, he worked on her car. He recalled seeing Harry Bush, then
Katherine's boyfriend, hit her, and theorized the complainant might be thinking of Bush instead of him. He
bore no animosity toward Katherine and the complainant and could not think why they should bear any
toward him.

 We conclude that factually sufficient evidence supports the judgment. There are some
inconsistencies in the testimony, but support for all the elements exists. The complainant consistently
testified to acts that would constitute indecency with a child by contact. The complainant's testimony that
the abuser's pubic hair was "dark" does not require acquittal absent some sort of context; it does not
support Kahmann's attempt to inculpate Eric Philippus. Kahmann's own testimony corroborates that he
was working on a car near the house during the relevant time in 1992. We cannot substitute our judgment
for the jury's decision. Based on the record before us, we cannot say that the jury's decision was so
against the overwhelming weight of the evidence as to be clearly wrong or unjust. We overrule point five.

 We affirm the judgment.


Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: June 5, 1997

Do Not Publish

1. Kahmann raises claims under both the federal and state constitutions. Though the provisions are
similar, they are not necessarily coextensive. Graham v. Texas Bd. of Pardons and Paroles, 913
S.W.2d 745, 751 (Tex. App.--Austin 1996, writ dism'd w.o.j.). Because Kahmann does not brief them
separately or point to different proof for eac