TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00121-CR







Mark Dietz, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT


NO. 0994422, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING







 Mark Dietz appeals his conviction for impersonating a public servant, see Tex. Pen.
Code Ann. § 37.11 (West Supp. 2001), for which he was sentenced to two years' probation. He
complains on appeal that there is a fatal variance between the indictment and the proof at trial, and
that the State introduced false evidence. We will overrule both issues and affirm the judgment of
the trial court.


FACTUAL BACKGROUND

The Impersonation Incident

 In the early morning of June 19, 1999, bail enforcement agent Mark Dietz attempted
to apprehend Nabor Rangel, who had failed to appear on a scheduled court date after posting bond. 
According to Dietz, a confidential source had informed him that Nabor Rangel could be found at the
apartment of his ex-wife, Ida Rangel. Dietz testified that he typically performs apprehensions with
a partner, but on that day his partner was ill and Dietz's seventeen-year-old son was with him. They
drove to the Booker T. Washington apartment complex but were unable to locate the address. When
Dietz's son spotted a police car nearby, they decided to ask the officer for assistance in locating the
apartment.

 According to Angelique Hooper, an officer with the Austin Police Department, Dietz
identified himself as a Travis County Sheriff's deputy and showed her his badge. Dietz told her that
he had a felony warrant for Nabor Rangel that he needed help serving. Hooper testified that it was
customary for Austin police officers to help other law enforcement officers serve felony warrants and
so she directed him to the apartment. Backup officer Julie Schroeder testified that she and Hooper
began doubting that Dietz was a law enforcement officer because of his behavior. According to the
officers, Dietz had a "cocky" and "authoritative" attitude, was "furtive" and "jumpy," and had only
a very poor quality photograph of the alleged "suspect." Dietz's behavior soon made it clear to the
officers that he was not a sheriff's deputy but rather a bail bondsman or bounty hunter. After they
learned from the dispatcher that Dietz had only a misdemeanor warrant, the officers refused to assist
him further. (1)

 Both officers testified that they stayed back while Dietz kicked at the door and forced
his way past Ida Rangel into her apartment. Ida Rangel testified that Dietz told her at the door that
he was a police officer. As he went in the apartment, he was brandishing a gun and yelling on his
cell phone. Ida testified that a man had called the apartment at six that morning saying he had a
Federal Express delivery for Nabor Rangel. She informed him that Nabor Rangel did not live at the
apartment, but the calls had continued.

 Ida Rangel's relatives Sara Figueroa and her husband Ruben Hernandez were staying
with her in the apartment; Hernandez testified that Dietz came upstairs into the room where they
were sleeping with their three children. He kicked their door open and pointed a gun at Hernandez
demanding to know if he was Nabor Rangel. Hernandez was frightened for himself and for his
children and wife. Ida Rangel's ten-year-old son was also in the apartment. He testified that he was
in the living room with his mother when Dietz kicked his way into the house and that he saw Dietz
point the gun at Hernandez. Ida Rangel testified that when he came downstairs, Dietz was "real
angry" and he appeared "crazy." When he could not locate Nabor Rangel, he left the apartment; on
his way out, he insulted Ida Rangel, a Puerto Rican U.S. citizen, calling her a "f***ing Mexican."

 Dietz presented a very different version of the incident. According to his testimony,
he never represented himself as a sheriff's deputy or police officer to Hooper, Schroeder or Ida
Rangel; rather, he testified that he clearly indicated that he was a bail enforcement agent. According
to Dietz, no one would have assumed that he was an officer based on his appearance. He went out
of his way to describe what he was wearing, which, if true, would have borne no resemblance to a
typical police or sheriff uniform. 

 Dietz testified that when he got the call that Nabor Rangel was allegedly at his former
wife's apartment, he and his son had been working on their ranch in Johnson City. He had not
wanted to take the chance of missing Rangel, so he came straight from the ranch without changing
his clothes. He testified that he had been castrating farm animals and clearing brush, so the shirt he
was wearing was covered with animal blood. Dietz stated that he had not shaved in days, that he was
wearing boots up to his knees with his jeans tucked into the boots, and that he had on a black hat
with a turkey feather in it. Neither police officer remembered seeing blood on Dietz's clothes. 
Hooper testified that Dietz was dressed in jeans and a denim shirt, and looked "decent." She did not
see any blood on his clothes and did not get the impression that he had been working with animals
or hauling brush.

 Dietz attempted to discredit the officers' testimony by implying that they should have
known that he was not a sheriff's deputy or other law enforcement officer. He introduced into
evidence the badge he was wearing that day and cross-examined Hooper regarding its appearance. 
When Hooper was able to closely examine the badge during the trial, she read the words "Fugitive
Recovery." She testified that on the morning of the incident, however, Dietz flashed the badge from
inside his vehicle, which was six or seven feet away from her. Moreover, she did not scrutinize the
badge because she initially took Dietz at his word when he told her that he was a sheriff's deputy.
Had she inspected the badge, she would have noticed that it did not resemble a police officer's or
sheriff's badge. Dietz also testified that he gave the officers his business card, which clearly
indicated his employment with a bail enforcement agency called "Stealth Hunters." Officer Hooper
testified, however, that Dietz never showed her his card. 

 Dietz also contradicted the account of his entry into Ida Rangel's home and his failed
attempt to apprehend Nabor Rangel. He admitted that he was carrying a gun, but explained that he
has a concealed handgun license, that his gun is always concealed, and that it was concealed during
this incident. He also disputed that he pointed the gun at any of the residents of the apartment. Dietz
claimed that he did not force his way into the apartment, but rather that Ida Rangel consented to let
him come inside.

 Dietz was charged in a three-count indictment for alleged offenses arising out of the
June incident. They included burglary of a habitation with intent to commit aggravated assault with
a deadly weapon, see Tex. Pen. Code Ann. § 30.02 (West Supp. 2001); aggravated assault with a
deadly weapon, see id. § 22.02(a)(2) (West 1994); and impersonating a public servant, see id.
§ 37.11 (West Supp. 2001). After a bench trial, Dietz was found guilty of only the less serious
offense of impersonating a public servant. (2) The judge sentenced him to two years' imprisonment
but suspended his sentence and placed him on probation. Dietz appeals the judgment and raises two
issues. He argues first that a material variance exists between the indictment and the proof at trial
and, therefore, the evidence is legally insufficient to sustain the conviction. Secondly, he contends
that the State introduced false evidence at trial.


DISCUSSION

Variance

 Section 37.11(a)(1) of the Penal Code provides that "[a] person commits an offense
if he impersonates a public servant with intent to induce another to submit to his pretended official
authority or to rely on his pretended official acts." Id. § 37.11(a)(1). The portion of the indictment
pertaining to the impersonation offense was descriptive of the incident. It states that Dietz
"impersonate[d] a public servant with intent to induce another, to wit: Ida Rangel and Sara Figueroa
and Ruben Hernandez and Angelique Hooper to submit to his pretended authority or to rely on his
pretended official acts." (3)

 At trial, Officer Hooper and Ida Rangel testified that Dietz explicitly told them that
he was a sheriff's deputy or a police officer. Hernandez and Figueroa's testimony did not allege that
Dietz impersonated an officer, only that he brandished his weapon in a threatening manner. Dietz
argues that since the evidence shows that he told only two of the four individuals named in the
indictment that he was a law enforcement officer, he cannot be guilty of violating section 37.11(a)(1)
as to the other two. In essence, it is Dietz's contention that a fatal variance exists between the
allegations in the indictment and the proof at trial. The sufficiency of the evidence to sustain a
criminal conviction is measured by the elements of the offense as defined in a hypothetically correct
jury charge for the case. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The court
of criminal appeals recently explained the application of Malik in cases of alleged variances between
the pleading and the proof:


[W]e hold that when faced with a sufficiency of the evidence claim based upon a
variance between the indictment and the proof, only a "material" variance will render
the evidence insufficient. Thus, the hypothetically correct charge will take into
consideration the fatal variance doctrine formerly expressed by this Court and today
reaffirmed. Allegations giving rise to immaterial variances may be disregarded in the
hypothetically correct charge, but allegations giving rise to material variances must
be included.



Gollihar v. State, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001) (footnote omitted).

 The indictment informed appellant that he was accused of impersonating a public
servant under section 37.11(a)(1). To violate section 37.11(a)(1), there must be a false assumption
or pretension by a person that he is a public servant and overt action in that capacity coupled with
the requisite intent. See Tovar v. State, 777 S.W.2d 481, 489 (Tex. App.--Corpus Christi 1989, pet.
ref'd); see also Boyett v. State, 368 S.W.2d 769, 771 (Tex. Crim. App. 1963) (interpreting
predecessor statutory provision). The prosecution proved both of these elements of the offense. 
Under Dietz's interpretation of the statute, however, the State also had to prove that Dietz
impersonated himself as a public servant to each person that he intended to induce to submit to his
pretended authority or to rely on his pretended official acts. The State asserts that it did not need to
prove that Dietz impersonated himself to every person involved in the incident but that under the
express terms of the statute, proof that Dietz impersonated himself to one person with the requisite
intent to induce "another" to submit to his pretended authority was sufficient.

 The plain language of the statute does not lend itself to the interpretation of section
37.11(a)(1) that Dietz urges us to adopt. By its terms, the statute is violated when an individual
impersonates a public servant with the intent that someone rely on his pretended official acts or
authority. See Tex. Pen. Code Ann. § 37.11(a)(1); Tovar, 777 S.W.2d at 489. The actor need not
succeed in actually inducing anyone to submit to or rely on his assumed authority; all that is required
is the impersonation and the intent. See Tex. Pen. Code Ann. § 37.11(a)(1); Tovar, 777 S.W.2d at
489. That such is sufficient to violate section 37.11(a)(1) reflects the underlying purpose of the
statute, which is to maintain public trust in law enforcement and government. See generally Russell
G. Donaldson, Annotation, "Acts as Such" Element of 18 USCS § 912, Making it a Crime to Pretend
to be an Officer or Employee of the United States, 55 A.L.R. Fed. 494 (1981) (discussing purposes
of federal impersonation statute, which are to maintain public respect and goodwill for the
government and government officials, and to maintain the dignity of government service). Every
time someone falsely assumes governmental authority, he implicates the purpose of such statutes.

 The purpose of section 37.11(a)(1) would be undermined if the State were required
to prove that a defendant held himself out as a public servant to each person that he intended to
induce to rely on or submit to his authority. For example, a person might impersonate a police
officer to an office building security guard and order the evacuation of the building, intending
thereby to induce everyone in the building to submit to his pretended authority. Neither logic nor
the language of section 37.11(a)(1) requires that the impersonation be addressed to each individual
in the building. 

 Dietz's primary objective was to get inside the apartment and search for Nabor
Rangel, who Dietz thought was hiding inside. He accomplished this objective by impersonating
himself as a sheriff's deputy to Officer Hooper and then as a police officer to Ida Rangel. Once
inside, he brandished his gun and threatened Hernandez and Figueroa, thereby evidencing his intent
that they submit to his pretended authority. The fact finder could reasonably conclude that his initial
impersonation to Hooper and Ida Rangel was intended to induce everyone in the apartment to submit
to his pretended authority. Indeed, the trial court explained that Dietz's initial deception was the
basis for his ruling that Dietz had violated section 37.11(a)(1) as set forth in the indictment:


[I] believe that there is competent credible evidence from both police witness[es] and
a civilian witness that this defendant did indeed represent himself as a member of the
Travis County sheriff's office and that truthfully none of this would have unfolded
the way it did if that hadn't happened. The reason that it went awry is because of
that initial deception. Had that initial deception not occurred, I don't think any of
this would have unfolded the way it did.



(Emphasis added.)

 Dietz's initial deception set in motion an event that ultimately affected all of the
people in the apartment that day. The indictment described the people that Dietz interacted with
during the incident. It is of no consequence that Dietz did not explicitly tell Hernandez or Figueroa
that he was a government official. Based on the plain language of the statute, we conclude that Dietz
violated section 37.11(a)(1) as set out in the indictment when he impersonated himself as a sheriff's
deputy to Officer Hooper and as a police officer to Ida Rangel to gain access to the apartment where
he then threatened the named others so that they would submit to his pretended authority. We hold,
therefore, that there is no variance between the allegations in the indictment and the proof at trial.

 Even if a variance does exist, it is not a material one: 


A variance between the wording of an indictment and the evidence presented at trial
is fatal only if "it is material and prejudices [the defendant's] substantial rights." 
When reviewing such a variance, we must determine whether the indictment, as
written, informed the defendant of the charge against him sufficiently to allow him
to prepare an adequate defense at trial, and whether prosecution under the deficiently
drafted indictment would subject the defendant to the risk of being prosecuted later
for the same crime.



Gollihar, 46 S.W.3d at 257 (quoting United States v. Sprick, 233 F.3d 845, 853 (5th Cir. 2000)). 
There is nothing in the record to indicate that the precise number of people to whom Dietz
impersonated himself as a public servant was crucial to his ability to conduct his defense to the
charged offense. Appellant argues that he faces the risk of being prosecuted again under a different
indictment because the evidence was insufficient to prove the allegations in the indictment as to
Hernandez and Figueroa. Even if Dietz were correct that the State's evidence failed as to Hernandez
and Figueroa, Dietz faces no further prosecution because the indictment on its face constitutes
evidence that he was charged with impersonating a public servant with respect to all four individuals. 
Moreover, the record indicates that Dietz was tried on the offense as to all four people. See Gollihar,
46 S.W.3d at 258 (stating that the "entire record, not just [the] indictment, may be referred to in
protecting against double jeopardy in event of subsequent prosecution") (citation omitted). We
conclude that any alleged variance is immaterial and should be disregarded in determining the
sufficiency of the evidence under a hypothetically correct jury charge. Because appellant's challenge
to the legal sufficiency of the evidence rests solely on an immaterial variance, if any, it is without
merit. 


False Evidence

 Dietz argues under his second issue that the State used false evidence to impeach his
credibility at trial. At trial, Dietz testified on his own behalf and offered a different version of the
June incident than that described by the State's witnesses. He also testified regarding his credentials
as a professional bail recovery agent and emphasized the importance of his work. "Well, when
people are arrested, they ultimately make bond through surety, and a great percentage of them don't
go to court. It's my job to locate them, find them and put them back in jail so they'll go answer to
the judge." He asserted that law enforcement officials were aware of and respected the work done
by bail recovery agents: "[The] police . . . were very receptive in that we were out there trying to do
the right thing." Dietz asserted that he had been an agent since 1986 and that no one had ever
questioned his credentials before this incident. He put evidence of these credentials before the trial
court, specifically, his badge and a card that indicates he is a member of the "United States
Professional Bail Bond Investigators Association."

 After Dietz testified as to his experience, the State was permitted, over Dietz's
objection, (4) to question him regarding his credentials. During the course of the questioning, the
prosecutor brought out the fact that Dietz had testified before the grand jury that he had been a police
officer with the Round Rock Police Department and that he had a private investigator's license. The
State then offered Exhibits 23, 24, and 25 to show that Dietz's grand jury testimony was false. 

 Exhibit 25 was an affidavit by the custodian of records for the Round Rock Police
Department stating that no employment records were found for Dietz. In his closing argument, the
prosecutor stated: "Mr. Dietz lied about having been a police officer, and that's why the Court has
an affidavit [certifying that] no business records from the Round Rock Police Department [had been
found]." Dietz did not object to Exhibit 25 or to the closing argument.

 On appeal, Dietz focuses on a letter to the prosecutor from RRPD's records
supervisor. The letter confirms that no employment records had been found for Dietz; it then adds
that Dietz had been a reserve officer with the department but that he was not there long enough to
"be allowed to write reports, supplements, or citations," so he was not listed in their computer
database. The letter was in the State's possession but the prosecutor did not file it with Exhibit 25
or introduce it at trial. Analogizing this to a prosecutor's knowing use of perjured testimony, (5) Dietz
asserts that the State deprived him of due process by introducing the affidavit stating that Dietz had
no employment records with RRPD when the prosecutor knew that Dietz had been a reserve officer
there.

 The State responds that by affirmatively stating "no objection," Dietz waived any
error from the use of Exhibit 25. It also challenges Dietz's characterization of Exhibit 25 as false
evidence; it suggests that more appropriately Dietz's argument is that the State failed to present a
complete picture of Dietz's record with RRPD. The State further notes that the explanatory letter
was contained in the prosecutor's trial notebook to which Dietz's attorney had access before trial. 
Dietz does not dispute that he had notice of the letter. Finally, the State contends that the evidence
was not material. See Ex Parte Castellano, 863 S.W.2d 476, 485 (Tex. Crim. App. 1993) (stating
that the use of perjured testimony is presumed material "unless a reviewing court is convinced
beyond a reasonable doubt that the perjury did not contribute to the conviction or punishment");
Duggan v. State, 778 S.W.2d 465, 469 (Tex. Crim. App. 1989) (explaining that "[b]ecause false
evidence corrupts the truth seeking function of trial, a new trial will be necessary unless the false
evidence does not violate the accused's right to due process").

 Setting aside any issue of preservation of error, we do not find that the State used
false evidence. Dietz does not contend, and we do not find, that Exhibit 25 was false on its face; nor
does the explanatory letter make the affidavit false. At most, the letter reveals that the affidavit was
incomplete. The omitted letter must be examined in the context of this case. Whether Dietz had
been a police officer with RRPD was not at issue in the case. Dietz created an issue regarding his
employment with RRPD by testifying before the grand jury about his experience as a police officer;
the State offered Exhibit 25 in response to this testimony as a way to impeach Dietz's credibility in
a case that came down to Dietz's word against the word of all of the State's witnesses. 

 Dietz was in the best position to present an accurate picture of his own experience
as an officer, which he did on redirect examination by explaining that no records were found because
he was a reserve officer with RRPD, but that he had been with the department for several months. 
Thus, Dietz was able to present the same information as that contained in the letter. Moreover, Dietz
apparently created any inaccuracy regarding his police experience by failing to specify that he was
a reserve officer with RRPD. Furthermore, the letter was consistent with the affidavit because it
confirmed that no employment records existed regarding Dietz. Therefore, the affidavit does not
constitute false evidence.

 In the case of a constitutional error such as the use of perjured testimony, we must
reverse a judgment of conviction unless we are convinced beyond a reasonable doubt that the error
did not contribute to the conviction. Tex. R. App. P. 44.2(a); Ex Parte Castellano, 863 S.W.2d at
485. In this case, because the evidence was not false, we need not apply the harmless error standard
contained in rule 44.2(a). 

 Dietz also asserts that Exhibits 23 and 24 constituted false evidence. The State used
these exhibits to contradict Dietz's testimony to the grand jury that he became a licensed private
investigator after the incident and that he had received a certificate indicating that he was licensed
on August 24, 1999. At trial, the State offered two affidavits from the Texas Commission on Private
Security. (6)
 One affidavit stated that as of September 21, 1999, the Commission had not located any
records indicating that Dietz was licensed. The second affidavit stated that a search of the
Commission's records revealed that Dietz was not licensed as a private investigator but that his
application for a license had been filed on or about September 23, 1999, just days after his
September 17 grand jury testimony; the application was incomplete as of January 21, 2000, the date
of the affidavit. At trial, the State used the two affidavits to show first, that Dietz's assertions to the
grand jury that he was licensed were false statements, and second, that Dietz's application for a
license was still incomplete.

 Dietz's attorney affirmatively stated that he had no objection to the exhibits when the
prosecutor offered them. Dietz argues on appeal, however, that his testimony before the grand jury
was that he had a "certificate of completion" which he equated with being licensed. Dietz's
argument is similar to his argument regarding Exhibit 25: He does not argue that the exhibits offered
by the prosecutor were on their face false or inaccurate, but rather that the exhibits created a false
impression in light of the certificate of completion. The certificate, however, was issued by a private
company, not the Commission. Nor does it indicate that it is a license; it merely states that it is a
certificate of completion of a "level one training course." Moreover, the fact that Dietz applied for
a license with the Commission days after his grand jury testimony undercut his position at trial,
which was that he believed that the certificate was equivalent to a license. Dietz's unreasonable
belief had no effect on the accuracy of the exhibits. (7) We do not find that the State introduced false
evidence by way of Exhibits 23 and 24. Therefore, we overrule Dietz's second issue.


CONCLUSION

 Having overruled both of Dietz's issues, we affirm the judgment of the trial court.



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: December 6, 2001

Publish
1.   Officer Schroeder testified on direct that Austin Police Department officers will not assist in
a forced entry apprehension of a suspect where only a misdemeanor warrant is involved.
2.   Burglary of a habitation with intent to commit a felony is a first-degree felony, Tex. Pen. Code
Ann. § 30.02(d) (West Supp. 2001); and aggravated assault is a second-degree felony, id. § 22.02(b)
(West 1994). Impersonating a public officer is a third-degree felony. Id. § 37.11(b) (West Supp.
2001).
3. The indictment also accused Dietz of a violation of section 37.11(a)(2). See Tex. Pen. Code
Ann. § 37.11(a)(2) (West Supp. 2001). When the judge announced his ruling from the bench, he
made clear that he was basing his judgment as to Dietz's guilt based on a violation of section
37.11(a)(1) and not of section 37.11(a)(2). Moreover, the parties do not address section 37.11(a)(2). 
Therefore, we confine our opinion to an analysis under section 37.11(a)(1).
4. Dietz's objection on the ground of relevance was overruled by the court, which explained that
Dietz's testimony on direct as to his experience made the State's questioning relevant. Dietz does
not argue on appeal that the questioning or exhibits introduced by the State to contradict Dietz's
testimony were improperly allowed on the ground of relevance. His challenge on appeal is only
directed at the alleged "falsity" of the State's evidence.
5. Appellant cites primarily Giglio v. United States, 405 U.S. 150 (1972), and Mooney v. Holohan,
294 U.S. 103 (1935).
6.   The Commission is the state agency that regulates and licenses private security officers. See 
Tex. Occ. Code Ann. § 1702.001-1702.389 (West 2000).

7. Dietz also asserts that the Commission on Law Enforcement Officer Standards and Education 
had records on file pertaining to Dietz, specifically documentation that Dietz had received a
proficiency certificate as a peace officer. Dietz further argues that this information, maintained by
a state agency, should be imputed to the prosecutor as the State's representative at trial. The State's
efforts to impeach Dietz concerned Dietz's testimony to the grand jury that he had received a private
investigator's license. We therefore do not address Dietz's arguments concerning documentation
of Dietz's proficiency as a peace officer.