Melvin Wayne DUGGAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 222–87.

Court of Criminal Appeals of Texas, En Banc.

Oct. 18, 1989.

Tim K. Banner and J. Stephen Cooper, Dallas, for appellant.

Emory C. Walton, Dist. Atty., William C. Dowell, Asst. Dist. Atty., Eastland, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant was convicted of aggravated possession of amphetamine and sentenced to fifty years confinement and a $50,000 fine. On appeal to the Eleventh Court of Appeals, appellant urged that the State's failure to correct the misleading testimony of two accomplice witnesses, who denied they exchanged their testimony for leniency in their cases, denied him due process and due course of law. In an unpublished opinion, the court of appeals affirmed the conviction, concluding without authority that because the record showed that no "formal" arrangement existed between the State and the accomplices, appellant was not entitled to show the jury that any agreement existed. *Duggan v. State*, No. 11–86–032–CR (Tex.App.—Eastland 1987). We granted petition for discretionary review to consider the question whether an agreement for leniency must be formalized before its introduction to the jury as evidence is proper. Tex.R.App.Pro., Rule 200(c)(2).

In a second ground for review, appellant urges that the court of appeals erred in concluding that the accomplice testimony was sufficiently corroborated. In a third ground for review, appellant argues that the statutorily required parole charge was unconstitutional and constituted reversible error. We granted these as well. Rule 200(c)(3), supra.

Appellant was arrested a few hours after his pickup truck was found at the scene of a drug lab which had been raided by law enforcement officers from two counties. Michael Payne and Michael Reynolds were arrested at the scene and told officers that appellant was involved in the drug operation. When appellant was arrested, the arresting deputy, and later a sheriff, noticed that he emitted a malodorous scent identical to the aroma they had detected at the drug lab. Except for the presence of appellant's pickup truck at the scene and the distinctive smell of the lab, the testimony of accomplices Payne and Reynolds was the only evidence connecting appellant himself to the possession of the amphetamine recovered during the raid.

During trial, the State introduced the testimony of Payne and Reynolds, both of whom claimed that appellant was the supervisor of the drug operation. In an effort to impeach their credibility, the defense sought to show the jury that their testimony was exchanged for the State's promise of leniency on their own cases. During cross examination of these two accomplice witnesses, the jury heard the following exchanges:

"Q: Mr. Payne, have you made some arrangements with the District Attorney's office for you to testify in this case?

A: No, sir.

Q: You have not?

A: No, sir.

Q: You have not, you don't have any kind of arrangement to receive some light punishment to come in here and testify today?

A: No, sir.

Q: You don't have anything in writing with the District Attorney's office?

A: No, sir.

Q: Is your attorney here present in the courtroom?

A: Yes, sir.

Q: Is that Mr. Inglesby?

A: Yes, sir.

Q: And your testimony under oath today is that you have no prearranged agreement, plea bargaining with the District Attorney to come in here and testify today?

A: That's right.

\*     \*     \*     \*     \*     \*

Q: Mr. Reynolds, I will ask you whether or not you had any arrangement with the District Attorney's office concerning the disposition of a case you may have involved, arising out of this 15th of March drug bust?

A: I have not made any kind of—we have not talked about any kind of leniency or anything toward this case in any way."

Later, the defense called Payne's neighbor in an effort to demonstrate to the jury that some sort of agreement did indeed exist. According to the neighbor, Payne told her that his own lawyer and Sheriff Cain, who had helped lead the raid, offered him probation in exchange for his testimony against appellant. In a brief cross examination, the State challenged the neighbor's testimony.

At a hearing on appellant's unsuccessful motion for new trial, however, the district attorney admitted that he agreed to give some consideration for the accomplices' cases in exchange for their testimony against Appellant. During the motion for new trial, the defense counsel elicited the following testimony from the prosecutor:

"Q: And, did you indicate to Mr. Payne and his lawyer that there would be some consideration for his testimony, if he testified for the State?

A: If he testified like he told us he would, yes sir.

\*     \*     \*     \*     \*     \*

Q: During the course of that conversation, did you indicate to [Reynolds] that in exchange for his testimony you contemplated taking less than harsh action with regard to his case?

A: My conversation with him was, I would take it into consideration if he testified."

Overruling appellant's challenge to the accomplices' testimony, the Court of Appeals scanned the record for a "formal

agreement" or an agreement "for any specific recommendation by the district attorney in exchange for their testimony." Finding no such precise or formal agreement, the court of appeals simply overruled appellant's due process and due course of law claims, citing no authority.

■ This court rejected this very approach in *Burkhalter v. State*, 493 S.W.2d 214, 216–17 (Tex.Cr.App.1973). There we decided that it was judicially imprudent to attempt to distinguish express agreements between the State and a testifying accomplice from those agreements which are merely implied, suggested, insinuated or inferred. Instead, we adopted, albeit implicitly, the standard articulated in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), to determine whether such an agreement exists, *viz:* whether the evidence, newly discovered or otherwise, "tends to confirm rather than refute the existence of some understanding for leniency." *Burkhalter v. State*, supra, at 217, n. 1. It makes no difference whether the understanding is consummated by a wink, a nod and a handshake, or by a signed and notarized formal document ceremoniously impressed with a wax seal. A deal is a deal.

■ The prosecutor himself in the present case confirmed the existence of an understanding between the accomplices and the State when he admitted telling the accomplices that he would consider leniency in exchange for their testimony. Because some sort of understanding between the State and the accomplices did indeed exist, the accomplices' firm, sweeping assertions that no such agreements existed lent a false impression to the court. Accomplice Payne denied having any kind of arrangement to receive leniency, while accomplice Reynolds claimed on the stand that "we have not talked about any kind of leniency or anything toward this case in any way." Given the prosecutor's post-trial admissions, the true nature of the relationship between the accomplices and the prosecution was misrepresented to the jury. This false impression, which the prosecutor should have perceived, nevertheless went unrectified throughout trial.

■ The prosecutor's constitutional duty to correct known false evidence is well established both in law and in the professional regulations which govern prosecutorial conduct. See *Burkhalter v. State*, supra, and *Williams v. State*, 513 S.W.2d 54, 56 (Tex.Cr.App.1974). See also the A.B.A. Standards for Criminal Justice, chapter 3 and the Texas Disciplinary Rules of Professional Conduct, Rules 3.04, 3.09. "It shall be the primary duty of all prosecutors ... not to convict, but to see that justice is done." Art. 2.01 V.A.C.C.P. This overriding duty falls upon the prosecutor in his capacity as the State's representative in criminal matters. As a trustee of the State's interest in providing fair trials, the prosecutor is obliged to illuminate the court with the truth of the cause, so that the judge and jury may properly render justice. Thus the prosecutor is more than a mere advocate, but a fiduciary to fundamental principles of fairness. See *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).

■ The duty to correct known false evidence is not only a prosecutorial ethic, but a constitutional requirement. See *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); see also, *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942), *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957) and *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence. See *U.S. v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976), (citing *Mooney* for principle that due process is violated when false evidence goes uncorrected by a prosecutor "who knew or should have known, of the perjury."); *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109 ("whether the nondisclosure [is] a result of negligence or design, it is the responsibility of the prosecutor."); *Napue v. Illinois*, 360 U.S. 264, 270, 79 S.Ct. 1173,

1177, 3 L.Ed.2d 1217, 1221 (1959) (" '[t]hat the district attorney's silence was not the result of guile or a desire to prejudice matters little ...,' " quoting *People v. Savvides*, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854, 855 (1956).). Nor does it matter that the falsehood goes merely to an issue of credibility. See *Napue*, supra (" 'A lie is a lie, no matter what its subject ...,' " again quoting *Savvides*.).

The purpose of imposing this paramount constitutional duty is "not to punish the prosecutor or the trial court for the error committed, but rather to avoid an unfair trial to the accused." *Burkhalter v. State*, supra, at 218. Stated another way, false evidence, left uncorrected, can mislead the factfinder, thereby misdirecting the due course of law and diverting due process from its intended progression toward a just and fair trial.

■ Because false evidence corrupts the truth seeking function of trial, a new trial will be necessary unless the false evidence does not violate the accused's right to due process. Error such as this is subject to the harm analysis found in Tex.R.App.Pro., Rule 81(b)(2). See *Ex parte Adams*, 768 S.W.2d 281 (Tex.Cr.App.1989). See also *Granger v. State*, 683 S.W.2d 387 (Tex.Cr. App.1984).

In his second ground for review, appellant argues that the court of appeals erroneously concluded that the evidence was sufficient to corroborate the accomplice testimony. Under Article 38.14 V.A.C.C.P., accomplice testimony must be "corroborated by other evidence tending to connect the defendant with the offense committed...." Rather than employing Article 38.14 to determine whether the other evidence tends to connect appellant with the offense, the court of appeals instead applied another test which requires only that the corroborating evidence make the accomplice testimony "more likely than not." We expressly disapproved this test in *Reed v. State*, 744 S.W.2d 112, 125 (Tex.Cr.App. 1988), and emphasized that the exclusive

test is the "tending to connect" analysis provided in Article 38.14.[1]

■ To properly determine the sufficiency of corroboration, the accomplice testimony must first be segregated and the remaining evidence surveyed for any incriminating connection between the accused and the crime. See, e.g., *Castaneda v. State*, 682 S.W.2d 535, 537 (Tex.Cr.App.1984). In the instant case, the remaining evidence shows that appellant's truck was parked at the drug lab and appellant himself possessed a distinctive smell reminiscent of the odor detected during the raid. The presence of appellant's truck at the drug lab does not by itself constitute an incriminating connection between appellant and the possession of amphetamine; the mere presence of accused with accomplices around the time of the offense, which such evidence seeks to establish, is a thread too slight by itself to sufficiently connect an accused with the crime. See *Johnson v. State*, 84 Tex.Cr.R. 400, 208 S.W. 170, 171 (1919); *Mitchell v. State*, 650 S.W.2d 801, 809 (Tex.Cr.App.1983). The peculiar scent recognized by officers both at the lab and on appellant's person is a more substantial strand of evidence, but one which by itself fails to associate appellant with the specific lab from which the amphetamine was seized. See *Walker v. State*, 615 S.W.2d 728, 733 (Tex.Cr.App.1981) (Independent evidence must connect accused to crime charged.). See also *Long v. State*, 39 Tex. Cr.R. 537, 47 S.W. 363, 364 (1898). However, when woven together, these two threads of evidence form a discernable pattern which does tend to tie appellant to the crime in question: appellant's drug lab fragrance associated him with such labs in general while the appearance of his truck at the raided lab tended to attach him to that clandestine drug operation in particular. The emission of the implicating smell from appellant's person, combined with the appearance of his truck at the lab site, supplies some momentum to the force of the accomplice claims that appellant was

1. The danger in the "more likely than not" test is that all manner of evidence can corroborate accomplice testimony, none of which may tend

to connect the accused to the alleged offense. *Reed* at 125, n. 10.

personally involved in the amphetamine operation and even supplied his own truck for the joint use of all participants. Based upon the unified strength of this corroborative evidence, we are persuaded that the testimony of the accomplices was corroborated by the quantum of this independent connective evidence. Thus we agree with the court of appeals' assessment that the combined independent evidence tended to connect appellant with the possession of amphetamine recovered from the raided lab, and was therefore sufficient to corroborate the accomplice testimony of Payne and Reynolds.[2]

■ Finally, appellant complained unsuccessfully on appeal that the parole charge given to the jury at the punishment phase was error on the ground that the charge is unconstitutional. Because appellant did not object to the charge, the court of appeals reviewed the record for "egregious harm," and finding none, overruled appellant's points of error. In *Rose v. State*, 752 S.W.2d 529 (Tex.Cr.App.1988), we decided not only that the statutory parole charge is unconstitutional, but that Rule 81(b)(2), su-

pra, is the proper standard to determine whether reversal is required.

We therefore vacate the judgment of the court of appeals and remand this cause to that court for an application of Rule 81(b)(2), supra, both to the prosecutor's failure to correct false evidence and, if necessary, the parole charge given to the jury during the accused's punishment trial.

WHITE, J., concurs in the result.

TEAGUE, J., dissents to the holding that the egregious prosecutorial misconduct that occurred in this cause is subject to a harmless error review pursuant to Rule 81(b)(2), Tex.R.App.Pro., and also reluctantly agrees that the testimony of the accomplices was corroborated by the quantum of the independent connective evidence.

---

**2.** Because appellant challenged the sufficiency of connective evidence to corroborate accomplice testimony, and not whether the strength of all evidence, including accomplice testimony, was sufficient to convict, we have addressed only that question.