# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00457-CR

**Samuel Ramirez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
## NO. 0992066, HONORABLE JON N. WISSER, JUDGE PRESIDING

Appellant Samuel Ramirez was convicted by a jury of official oppression. Tex. Pen. Code

Ann. ' 39.03 (West 1994).[1] The trial court assessed his punishment at three months in the county jail.

### Points of Error

Appellant advances three points of error. First, appellant urges that the trial court erred in

permitting a clinical social worker to testify as an expert witness outside of her field of expertise and to give

---

[1] The indictment alleged official oppression by: (1) mistreatment of the complainant; and (2) sexual harassment of the complainant. The trial court submitted both counts to the jury in the disjunctive. The jury returned a general verdict finding appellant guilty Aas alleged within the indictment.@ When different theories of the offense are submitted to the jury in the disjunctive, a general verdict is sufficient if the evidence supports one of the theories. *See Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1992); *Skillern v. State*, 890 S.W.2d 849, 877 (Tex. App.CAustin 1994, pet. ref=d).

opinion evidence regarding the complainant, based on a review by the witness of a report by a non-testifying Apsychologist,@ whose own qualifications were never established. Appellant claims his rights under the Sixth and Fourteenth Amendment to the United States Constitution were violated.

Second, appellant asserts the suppression of evidence by the prosecutors. He contends that the trial court erred in overruling the motion for new trial when it was established that the prosecutors failed to disclose exculpatory and impeaching evidence that the complainant had, prior to trial, filed a civil lawsuit against the City of Austin and appellant arising out of the same events giving rise to the instant indictment; and that the State knowingly used false evidence from the complainant in this regard tainting the conviction obtained. Appellant claims that he was deprived of due process of law, a fair trial, and the effective assistance of counsel. Appellant complains that the suppression of evidence occurred despite the granting of his pretrial *Brady v. Maryland*, 373 U.S. 683 (1963), motion for the State to disclose exculpatory evidence.

Third, appellant contends that the trial court erred in not granting a mistrial motion when the prosecution twice failed to comply with the court=s rulings on motions in limine resulting in the introduction of inadmissable, prejudicial, and harmful evidence.

We shall sustain the second point of error and reverse the conviction on the basis of the suppression of evidence by the prosecution.

**Facts**

Appellant does not challenge the legal or factual sufficiency of the evidence, but the facts set the stage for our disposition on the issue of suppression of evidence advanced in the second point of error.

2

The instant case has been a difficult one for both the State and defense, not only because a police officer was involved, but because the case turned, in large measure, on the credibility of the complainant who had a criminal record and a less than desirable background. The credibility of the complainant, of course, was an issue for the jury. The State did have a test showing that the semen saved by the complainant from an oral sex act contained a mixture of the DNA of appellant and complainant. Appellant contends that the sexual act was consensual; that the complainant whose background included drug addiction had, with an ulterior motive, lured him back to the house where the act occurred; and that when she called the police after the act, she also called an attorney and lied about this latter fact to the first police officer on the scene.

On the morning of March 13, 1999, at about 11:52 a.m., Austin Police Officer Ivey Yancy responded to a report of a disturbance at 6708 Millrace Street. There he found that two women had been fighting over a piece of meat. One of the women was D.C., the complainant in the instant case. The other woman was a friend of D.C.=s aunt who lived at the address. Neither woman wanted to file charges, so to diffuse the situation, Officer Yancy agreed to take D.C. to another location. D.C.=s aunt told the officer that D.C. was a crack cocaine addict.

Officer Yancy first took D.C. to an address on Greenwood Street, but no one was home. At D.C.=s instructions, Yancy took her to 2705 Hoeke Lane, number 100, in a trailer park. D.C. told Yancy that she had lost her key, that her boyfriend or husband frequently changed the code on the burglar alarm, and that she might set off the alarm in entering the house. Yancy gave her his Abusiness card.@ Later, he heard police radio reports of a burglar alarm at the address and notified the responding officers that he had just delivered D.C. to her home.

3

Austin Police Officer James Cottingham testified as a State=s witness. He was on patrol about 12:40 p.m. on March 13, 1999, when he received a radio dispatch about a burglar alarm at 2705 Hoeke Street, and proceeded there. As he arrived, he received a radio message from Officer Yancy that he had just dropped off a woman at that address who had earlier been involved in an assault. Cottingham said that about the same time appellant, another uniformed police officer, arrived separately in his own vehicle. Appellant knocked on the door. D.C. opened the door, turned, and sat on a couch. The officers entered the house. When asked by appellant how she Agot there,@ D.C. responded that Officer Yancy had brought her there and displayed Yancy=s card. According to Cottingham, they did not ask for identification or examine the alarm system because Yancy=s report had been confirmed. Cottingham observed that the Playboy channel on the television set was displaying a topless woman. Appellant asked D.C. why she was watching it, and she replied that she liked to watch it so she would be ready for her truck driver boyfriend when he got home, that she Alearned new stuff from watching the program.@ Cottingham observed that the television began advertising movies, and appellant inquired when the movies started. D.C. responded that they started at 3:00 p.m., and appellant stated, AI think I=ll come back at 3:00 p.m.@ D.C. Alaughingly@ said, AOkay, you can come back at 3:00, but your wife might get mad at you because you might . . . you might learn something new.@

Cottingham thought D.C.=s conduct was inappropriate, that the conversation was Ajoking,@ but he felt there was Aheavy duty flirting between D.C. and appellant.@ Cottingham tried to divert the conversation to the earlier assault, but it soon reverted to the Playboy television channel and the means and costs of accessing that channel. At this time, the television set was showing previews of movies displaying sexually oriented material. Cottingham again changed the subject to the stained-glass house windows, but

4

soon D.C. again invited appellant to return to watch the movies. Cottingham decided to leave, and appellant caught up with him before they reached their vehicles.

Brenda Brown lived at 2705 Hoeke Lane, number 96, across from number 100 where D.C. stayed at various times. Brown arrived home from work about 3:00 p.m. on March 13, 1999, and observed a police car parked in front of number 100. Approximately fifteen minutes later, D.C. came to Brown=s house and stated that she had been sexually assaulted by a police officer. Brown urged D.C. to call the police, which she did. When Detective Beth Young arrived, D.C. was still using Brown=s telephone, and Brown told Young that D.C. was talking to the police. D.C. later admitted to Young and Brown that she had, in fact, been talking to an attorney.

Brown related that in the past D.C. had borrowed a screwdriver in order to get into trailer number 100; that D.C. referred to the man she lived with as her Aold man,@ but Brown characterized the relationship as Astormy@; that when Brown saw police cars in the past at the trailer house, D.C. would tell Brown that her Aold man@ was trying to get her to leave.

When D.C. testified, the State, early on and up front, decided to get her record and background before the jury. The thirty-two-year-old D.C. had four children, all with different fathers. The first child was born when she was fifteen years of age and still in high school. Three of her children were living with her mother, and the youngest had been adopted.

At the time of the trial (March 2001), D.C. was in the Williamson County jail for non-support of her children and had a pending possession of cocaine indictment in Travis County. D.C. admitted that she became addicted to powdered cocaine while in high school. In 1992, D.C. was convicted of burglary and received a five-year prison sentence, and in 1996, she was convicted of delivery

5

of a controlled substance. D.C. also admitted several misdemeanor convictions including a shoplifting conviction.

D.C. stated that on March 13, 1999, she was living with O.J. Williams at 2705 Hoeke Lane, number 100; that they were engaged but not married; that their relationship was an "up and down one"; that on March 13, 1999, she was four or five months pregnant; that earlier O.J. began "messing around" and she decided to "mess around" and got pregnant by another man; that this fact caused arguments with O.J. followed by physical violence; and that O.J. called the police "all the time" and would tell them: "I want her out." D.C. related that they then would "get back together."

On March 13, 1999, D.C., who had been away for several weeks, was at her aunt=s house and got involved in a fight with another woman. Officer Yancy took her to the Hoeke Street address. Thereafter, she opened O.J.=s door with a Lone Star credit card. When the alarm went off, she used a "1, 2, 3, 4" code to turn it off but the alarm came back on. D.C. pulled the coil and disarmed it. D.C. then turned on the television set and flipped to the Playboy channel. Two uniformed police officers came to the door and inquired about the alarm, suggesting she had not timely punched in the code. The officers entered the house and began looking at the television. D.C. identified appellant as one of the officers. Appellant asked D.C. about the cost of the Playboy channel, which she did not know. When asked why she watched that "stuff," D.C. replied that she did it to learn new ways and that she and her fiancé watched it together. D.C. described appellant as being "horny" and "excited." D.C. asked appellant if he was married. He answered, "no," but added that he had a girlfriend who did not "do all this." D.C. described the conversation as a friendly, joking, and laughing one. When D.C. mentioned that the movies came on at 3:00 p.m., appellant said that he would be back at that time and "we laughed it off." D.C. recalled that as

6

appellant left, he remarked, AI=m getting horny already.@ D.C. thought that appellant was joking about coming back and said, AYour girlfriend might find out that, you know . . . learned new ways.@ D.C. said she was Ajoking around@ and did not have the impression that anyone was flirting with her.

D.C. testified that after the officers left, she retreated to the couch with a cover and a pillow and fell asleep. She was awakened by a knock at the door. Appellant had returned. He said that he came to help with the alarm, but it had not gone off again. Appellant entered the house, took a seat, and asked about the Playboy channel. D.C. explained that she had been asleep. D.C. became concerned that O.J. would come home and find her with the officer. She told appellant that he had to leave. When he didn=t, D.C. told him that she was going across the street to call O.J. As she started to leave, appellant grabbed her by the arm and pulled her into his lap and began feeling her breasts and moving underneath her. Appellant asked if she had been with a police officer before. D.C. told him that she had been assaulted by a Taylor Police Officer, thinking that might make appellant quit what he was doing. D.C. did not try to run because of her pregnancy. She went to the couch and laid down telling appellant that she was sleepy. D.C. related that she began rubbing her stomach and her leg under the cover, a nervous habit due to her pregnancy. Appellant asked what she was doing, and D.C. told him that she was Anot feeling on herself.@

D.C. testified that the armed appellant approached her with his penis out of his pants, held her down on the couch, and forced her to commit an act of oral sex. D.C. testified she was Atired of all this stuff@ and thought that no one would believe her. When the act was completed, she immediately went to the bathroom and spit what was in her mouth into a plastic bag. When she came out of the bathroom, appellant received a report on his shoulder radio about an assault on another police officer and left the house, telling

7

D.C. that he would be in touch with her. D.C. denied that she was on drugs that day, although she had been taking drugs off and on during her pregnancy.

D.C. went to Brenda Brown=s house and reported the sexual assault. She telephoned a hospital, the police, 911, and an attorney. When Detective Beth Young arrived, D.C. thought Young was rude in telling her to hang up the telephone or that Young would leave. D.C. told Young what had happened and gave her the plastic bag. O.J. arrived home about this time. Young told O.J. what had occurred because D.C. was too scared to tell him. O.J. was upset about the condition of his alarm system, so D.C. suggested that the police had disabled the alarm. While Young talked to O.J. separately, other officers arrived on the scene and questioned whether she lived there and wanted to charge her with burglary. In front of the police officers, O.J. accused her of burglary, told her that she deserved what happened, gave her a criminal trespass warning, and told her not to come back. D.C. reported that a week later, O.J. was calling her mother and aunt trying to get her to come back. Apparently, D.C. then stayed for two months with Kenneth Hill, a cousin to Charlie Hill, the father of her unborn child. When Charlie Hill went to state jail, D.C. reported that her Anext boyfriend@ was Michael White. She went back and forth between White and O.J., but the baby was born while she was at the Hoeke Lane address.

Still on direct examination, the prosecutor inquired about Danny Gratten, a Taylor Police Officer, whom D.C. testified sexually assaulted her in 1994. She said that Gratten kept trying to connect her with a murder, but that she took a lie detector test and was cleared; that Gratten was fired as a police officer because of numerous complaints, but he was never prosecuted for assaulting her.

It was during the direct examination of D.C. that appellant claims the suppression of evidence occurred which we will discuss later. On cross-examination, appellant=s counsel reviewed with

8

D.C. her criminal record, pending charges, and her children and their fathers. Counsel established that D.C. had lied to the grand jury about O.J. Williams being the father of her last born child; that her grand jury testimony was unlike her trial testimony concerning her conversation with appellant and Cunningham when they arrived at the trailer house; and that her sworn statement to an Officer Fleming on March 16, 1999, in which she stated she reported the Gratten assault on her the morning after it occurred in May 1994, was inconsistent with the fact that in truth she did not report it until fifteen months later, and only then when an investigator talked to her about Gratten while she was in jail.

Karen Sculice, a DNA analyst with the Department of Public Safety, testified that she tested mouth swabs from appellant and D.C. and found the contents of the plastic bag delivered to her were a mixture of the DNA of appellant and D.C. The contents of the bag upon analysis showed seminal fluid without the presence of spermatozoa.

Janesta Sturrup, a clinical social worker in private practice, testified for the State. Her testimony as an expert is the subject matter of the first point of error and was admitted over numerous objections. She testified that D.C. was suffering from post-traumatic stress syndrome at the time of the incident in question due to her earlier experience with Danny Gratten, another police officer. Sturrup stated that during the incident, D.C.=s Aself separated from body,@ and that when D.C. pulled the cover over herself she was Ain flight,@ an act of disappearing. Sturrup added: AIn this case, very creatively, but traumatically, Mrs. C. saved the semen in her mouth.@

The defense called Mary Bartlett, a retired Taylor Police Lieutenant, who testified that she had known D.C. since D.C. was in junior high school and that D.C.=s reputation for being a peaceable and law-abiding citizen and for truthfulness was bad.

9

Detective Beth Young, a defense witness, was the police officer who responded to D.C.=s call from the Brown home on March 13, 1999. Young found D.C. on the telephone at the Brown home, and she would not hang up. Young saw the yellow pages of the telephone directory opened under Aattorneys.@ D.C. was talking softly, and Young heard her ask if Ashe should trust her, talk to her.@ When Young threatened to leave, D.C. finally hung up. To Young, D.C., at the time, did not appear upset, in shock or fearful. D.C. did not appear to have any bruises on her arms nor did she display any. D.C. became upset after Young began to talk separately with O.J. Williams who had arrived home and stated that D.C. Awasn=t supposed to be there@ and Ashe probably wanted it that way.@ D.C. began to shout and pound on the door to the house where Young was talking with Williams, demanding her evidence, and wanting Young to focus on her. Detective Young, concerned for her safety, called for other officers who soon arrived. Later, Young and Officer Kresta interviewed D.C. at the police station, and a videotape was made.

### Evidence of Suppression

With these facts as a backdrop, we turn to the record relied upon to reflect the claimed suppression of evidence. During the direct examination of D.C., she was asked generally what happened when she went to Brenda Brown=s house after the incident in question. In the course of a long narrative-type answer, D.C. stated:

> I called APD. Then I called the 911 and then I had called like an attorney, but I was just asking him what should I do. I didn=t know who to trust, you know. But it wasn=t no attorney in no way where I=m looking for anything out of it, you know. I=m just looking for justice out of this, I=m not worrying about no money or nothing.

10

Q: All right. So you were just trying to get some advice.

A: Yes, I was just trying to get some advice.

Subsequently, still on direct examination, the prosecutor elicited from D.C. that at Asome point@ she contacted Gary Bledsoe, a civil attorney; that Captain White, a retired police officer, Atracked@ her and gave her a list of attorneys from which list she selected Bledsoe. The record then reflects:

Q: Okay. Did you contact Gary Bledsoe to try to get money or anything like that?

A: No, I=m not worried about money. I just want justice out of the whole case.

At the hearing on the motion for new trial, attorney Gary Bledsoe testified that D.C. had signed a contigency-fee contract with him in June 1999 authorizing him to bring a civil lawsuit seeking damages based on the events underlying the alleged criminal offense; that he did not file the civil lawsuit against the City of Austin and appellant until March 13, 2001, two years after the offense and thirteen days before the instant jury trial; that a private process server was employed; that the City of Austin was served with citation on April 2, 2001, the day the jury returned its verdict; and that appellant was not served until April 13, 2001. Attorney Bledsoe did not know why the process server did not serve appellant during trial except perhaps not to disrupt the trial. Bledsoe acknowledged that he did not inform D.C. of the filing of the civil suit as she was in the Williamson County jail at the time. He notified her only after the trial. *Bledsoe, however, testified that prior to trial he informed the particular prosecutors in the criminal case that he had filed the civil lawsuit or intended to do so shortly thereafter*. The State does not dispute this testimony. The State elicited the complained-of testimony and allowed it to remain uncorrected

11

despite the granting of appellant=s *Brady* motion. It is clear that prior to the conclusion of the guilt/innocence stage of the trial that Bledsoe did not notify appellant or his counsel of the filing of the civil lawsuit.

## Discussion

Appellant relies both upon the *Brady v. Maryland,* 373 U.S. 83, 87 (1963),[2] line of cases and the line of cases represented by *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (knowing use of false testimony violates federal requirement of due process and denies accused fair trial).

In *Giglio v. United States*, 405 U.S. 150, 153 (1972), the Court acknowledged that since *Mooney*, it has been clear that deliberate deception of a court and jurors by the presentation of known false

---

[2] In *Brady*, the United States Supreme Court stated:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id*. at 87.

In *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999), the Supreme Court discussed briefly some of the changes in the *Brady* rule since its adoption. The Court stated:

> We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v Agurs*, 427 U.S. 97, 107, (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v Bagley*, 473 U.S. 667, (1985). Such evidence is material Aif there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.@ *Id*. at 682, 87 L Ed 2d 481, 105 S Ct 3375; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434, (1995). Moreover, the rule encompasses evidence Aknown only to police investigators and not to the prosecutor.@ *Id*., at 438. In order to comply with *Brady*, therefore, Athe individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government=s behalf in this case, including the police.@ *Kyle*, 514 U.S. at 437.

evidence is incompatible with Athe rudimentary demands of justice.@ *See Pyle v. Kansas*, 317 U.S. 214, 216 (1942). And in *Napue v. Illinois*, 360 U.S. 264 (1959), the Court concluded that the same result obtains when the prosecution, Aalthough not soliciting false evidence, allows it to go uncorrected when it appears.@ *Id*. at 269; *see also Giglio*, 405 U.S. at 153. When the reliability of a given witness may well be determinative of the guilt or innocense of an accused, nondisclosure of evidence affecting credibility falls within the general rule discussed. *Giglio*, 405 U.S. at 154. This line of cases has sometimes been referred to as the *Mooney-Pyle-Napue* line of decisions. *See* 42 George E. Dix & Robert O. Dawson *Texas Practice: Criminal Practice and Procedure* ' 22.51 (2d ed. 2002) (hereinafter Dix); *see also generally Giles v. Maryland*, 386 U.S. 66 (1967); *Miller v. Pate*, 386 U.S. 1 (1967); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Ex parte Castellano*, 863 S.W.2d 476 (Tex. Crim. App. 1993); *Ex parte Adams*, 768 S.W.2d 281, (Tex. Crim. App. 1989); *Davis v. State*, 831 S.W.2d 426, (Tex. App.CAustin 1992, no pet.).[3]

Although *Brady* relied upon *Mooney*, *see Kyles v. Whitley*, 514 U.S. 419, 432 (1995), and there have been suggestions that the *Mooney* line of cases were incorporated in the later *Brady* rule, the

---

[3] Article I, section 19 of the Texas Constitution provides the same protection against false testimony as the *Mooney-Pyle-Napue* line of cases. *See Ex parte Adams*, 768 S.W.2d 281, 293 (Tex. Crim. App. 1989); 42 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* ' 22.51 n.4, 5 (2d ed. 2001). Appellant has not raised a state constitutional issue.

two lines of decisions are distinctive. *See United States v. Agurs*, 427 U.S. 103, 104 (1976). It has been stated:

> Although *Brady v. Maryland* and its progeny suggest the due process duty to disclose may have superseded and replaced the prohibition against the use of perjured testimony, this is not the case. The prohibition against the use of perjured testimony remains available to defendants as an alternative to *Brady* arguments. *Mooney* contentions are sometimes more attractive to defendants because the criterion for determining the materiality of improperly used perjured testimony is more lenient than that for determining the materiality of improperly suppressed exculpatory evidence under *Brady*.

> The difference between the two due process rules is not entirely clear. Some situations will present viable arguments that both were violated. If a defendant is able to establish both that the State knowingly used perjured testimony and that it failed to disclose evidence showing the falsity of the testimony, the defendant is entitled to relief if he or she can show the testimony used is material under the perjured testimony line of decisions and its more relaxed materiality standard.

Dix, ' 22.5 (citations omitted).

While appellant relies upon both due process rules, we conclude it is necessary to examine only the *Mooney-Pyle-Napue* line of decisions to reach the proper disposition of appellant=s contention. We review the record to determine if the State Aused@ the testimony, whether the testimony was Afalse,@ whether the testimony was Aknowingly used,@ and if these questions are affirmatively answered, whether there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.

### Was Testimony Used?

The *Mooney-Pyle-Napue* line of cases require that the prosecution have Aused@ certain testimony, while the *Brady* line of decisions demands only passive nondisclosure. *See* Dix, ' 22.52. In the instant case, the State clearly Aused@ the testimony. First, the State on direct examination clearly permitted

14

D.C. to testify without correction that she was not looking for money but seeking justice. Second, the

State, still on direct examination,[4] directly elicited from D.C. that she had contacted a named lawyer, but

permitted her to expressly deny that she did so Ato get money,@ and to declare again that her interest was

only in justice.

**Testimony Must Have Been AFalse@**

Many cases discussing a *Mooney-Pyle-Napue* contention refer to the testimony as being

Aperjured testimony@ or as involving Aperjury.@ *See, e.g., Pyle,* 317 U.S. at 216. While this terminology is

still used, it is sufficient if the testimony is false and misleading to the trier of fact. *See Napue*, 360 U.S. at

269; *Alcorta*, 355 U.S. at 32.

> There is no need for a defendant to show the witness knew the testimony was false or
> otherwise harbored a sufficient culpable mental state to render the witness subject to
> prosecution for perjury. Moreover, the Court of Criminal Appeals has made clear that
> whether the rule is violated or not does not depend upon the defendant=s ability to

---

[4] The Court of Criminal Appeals, applying the *Mooney-Pyle-Napue* line of decisions, has found Ause@ by the State where the testimony was given by a State=s witness on cross-examination by the accused. *See Duggan v. State*, 778 S.W.2d 465, 468 (Tex. Crim. App. 1989); *see also Burkhalter v. State*, 489 S.W.2d 214, 218 (Tex. Crim. App. 1973); Dix, ' 22.52. It has been said that the Supreme Court in *Alcorta v. Texas*, 355 U.S. 28 (1957), extended the *Mooney-Pyle-Napue* line of decisions to the Apassive@ use of testimony by the prosecution. *See Ex parte Castellano*, 863 S.W.2d 476, 480 (Tex. Crim. App. 1993).

15

demonstrate the witness=s specific factual assertions were technically incorrect or Afalse.@ It is sufficient if the witness=s testimony gives the trier of fact a false impression.

Dix, ' 22.53.

Here, the complainant=s testimony that she was not looking for money and that her contract with attorney Bledsoe was not Ato get money@ was false and misleading. Bledsoe=s testimony at the hearing on the motion for new trial made clear that he had a written contract with the complainant to bring a civil lawsuit for damages against the City of Austin and appellant; that the lawsuit was not filed until two years after the offense; *and that prior to trial he had notified the prosecutors in the criminal case of the filing of the civil case or its impending filing. When D.C. gave her trial testimony, there was a civil suit on file*. Thus, her testimony was false and misleading. The State contends that D.C. had been in the Williamson County jail for several weeks before and during the trial, and that Bledsoe acknowledged that he had not notified D.C. that he had filed the civil lawsuit in accordance with their contract. The State contends that the complainant had no knowledge that the civil lawsuit had been filed and did not know her testimony was false. *The State, however, knew and took no action*.

In *Burkhalter v. State*, 493 S.W.2d 214 (Tex. Crim. App. 1973), the defendant was charged with being an accomplice to murder. The State=s principal witness, Whitehurst, was indicted for the murder as a principal. Whitehurst=s attorney told him that his testimony Acould help him,@ but Whitehurst was unaware of an understanding between his attorneys and the prosecutor that if he testified without claiming immunity he would not be prosecuted. When asked on cross-examination whether he expected (because of his testimony) to be free of all criminal charges, he answered in the negative. The trial court refused to allow the defendant (Burkhalter) to show the understanding with the prosecutor.

16

The appellate court, relying heavily upon *Giglio* and *Napue* found a due process violation when the defendant was denied the opportunity to refute the inevitable impression that such testimony had on the jury. *Burkhalter*, 493 S.W.2d at 218. The court also stated:

> We fully appreciate the State=s position that there was no false evidence here, since Whitehurst did not *know* that he would not be prosecuted. Even if we assume this ignorance, we find that the prosecutor=s silence as to the plan not to prosecute conveyed an impression to the jury which the State knew to be false and one which should have been corrected.

*Id*. (emphasis in original); *see also Duggan*, 778 S.W.2d at 468.

Even if D.C. did not know at the time of her trial testimony that a civil suit had been filed, the State knew her testimony was false and misleading and used it. *See Burkhalter*, 493 S.W.2d at 218. We reject the State=s apparent contention that appellant was required to show D.C.=s awareness of the lawsuit before his due process claim could be advanced.

**State=s Use of Testimony Must be AKnowing@**

Another factor to be considered in applying the *Mooney-Pyle-Napue* line of decisions is whether the State made *knowing* use of false or perjured testimony. Our earlier discussion constitutes an affirmative answer to this inquiry. Prior to trial, the very prosecutor who conducted the direct examination of the complainant was personally made aware of the civil lawsuit. There is no dispute on this point. We are not confronted here with knowledge possessed by a member of the Aprosecution team@ which must be imputed to the prosecutor actually trying the case. *Cf. Castellano*, 863 S.W.2d at 485; *Ex parte Bradley*; 781 S.W.2d 886, 892 n.7. (Tex. Crim. App. 1989).

17

**Materiality**

The *Mooney-Pyle-Napue* due process prohibition against the use of false testimony contains no explicit requirement that the improperly used testimony be Amaterial.@ Dix, ' 22.55. A violation of this prohibition demands a conviction be set aside or rendered invalid, but only if there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. *See Agurs*, 427 U.S. at 103; *Adams*, 768 S.W.2d at 292; *Granger v. State*, 683 S.W.2d 387, 391 (Tex. Crim. App. 1984); *Davis*, 831 S.W.2d at 439. AThis is essentially the harmless error standard for constitutional error embodied in the Texas Rules of Appellate Procedure 44.2(a).@ Dix, ' 22.55; *see also Chapman v. California*, 386 U.S. 18, 24 (1967); *Castellano*, 863 S.W.2d at 485.

In the instant case, D.C. was the essential witness linking appellant to the acts of official oppression alleged in the indictment. Her false testimony was critical in evaluating the witness=s credibility in view of her extremely questionable background. *See Sambrano v. State*, 754 S.W.2d 768, 771 (Tex. App.CSan Antonio 1988, pet. dism=d). When the reliability of a given witness may well be determinative of guilt or innocence, *nondisclosure of evidence affecting credibility falls within the Mooney line of cases*. *See Giglio*, 405 U.S. at 154; *see also Burkhalter*, 493 S.W.2d at 218.

The jury should have had the opportunity to determine the witness=s credibility with full knowledge of the false testimony. It is noted that during the jury=s deliberations, it sent a note to the trial court inquiring whether a verdict should be reached on one witness=s testimony with no corroborating evidence and indicating the jury was deadlocked at that point. The trial court simply instructed the jury to continue its deliberations.

18

In a letter notifying counsel of the overruling of the motion for new trial, the trial court noted its concern Athat some of the conduct of the State was not as professional as it should have been.@ *Cf*. Tex. R. App. P. 21(b).

Article 2.01 of the Texas Code of Criminal Procedure provides in pertinent part:

> It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused.

Tex. Code Crim. Proc. Ann. art. 2.01 (West Supp. 2002).

Under the circumstances, we conclude that the judgment of the jury could have been reasonably affected by the State=s use of false testimony and its failure to correct the same. *See Granger*, 683 S.W.2d at 391; *Sambrano*, 754 S.W.2d at 771. The federal constitutional due process error here calls for a reversal of the conviction because we are not convinced beyond a reasonable doubt that the error did not contribute to the conviction. *See* Tex. R. App. P. 44.2(a). The court erred in overruling the motion for new trial.

> Society wins not only when the guilty are convicted but when criminal trials are fair, our system of the administration of justice suffers when any accused is treated unfairly.

*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The prosecutor is:

> [T]he representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligations to govern at all; and

19

whose interest; therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United State*, 295 U.S. 78, 88 (1935).

AWhether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.@ *Giglio*, 405 U.S. at 154. The second point of error is sustained.

## Other Points of Error

We need not address the first and third points of error in view of our disposition of the second point. We express our concern, in the event of a retrial, regarding the admissibility of the clinical social worker=s testimony. A trial court must insure that an expert witness is truly testifying as an expert and not merely serving as a conduit through which hearsay is brought before the jury. 2A Steven Goode, et. al; *Texas Practice: Courtroom Handbook on Texas Evidence* Ch. 5, Rule 703 (West 2002) (citing *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987); *Cole v. State*, 839 S.W.2d 798, 813-16 (Tex. Crim. App. 1990) (Maloney, J., concurring)).

The judgment is reversed and the cause remanded to the trial court.

John F. Onion, Jr., Justice

Before Justices B. A. Smith, Yeakel and Onion[*]

Reversed and Remanded

Filed: July 26, 2002

20

Publish

&ast;    Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov=t Code Ann. ' 74.003(b) (West 1998).