In The
Court of Appeals
For The
First District of Texas




NO. 01-08-00423-CR




MIGUEL RODRIGO SANCHEZ, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from County Criminal Court at Law No. 5
Harris County, Texas
Trial Court Cause No. 1452011


 



 
MEMORANDUM OPINION
          A jury convicted appellant, Miguel Rodrigo Sanchez, of driving while
intoxicated. See Tex. Penal Code Ann. § 49.04 (Vernon 2003). The trial court
assessed punishment at 180 days in jail, probated for one year, plus additional fines,
fees, and community service. In a single point of error, appellant contends that the
trial court erred in denying his motion for new trial because the record shows that the
State knowingly permitted false testimony to be given. We affirm.
Background
The Arrest
          Appellant was arrested for driving while intoxicated on May 5, 2007, in
downtown Houston. Houston Police Department Officer Garcia, who was patrolling
on foot, testified that he noticed appellant driving without a seat belt and ordered
appellant to roll down his window. After noticing an “odor of alcohol” coming out
of the car, Garcia asked Officer Santuario, who was standing nearby, to administer
field sobriety tests to appellant. Santuario testified that he noticed a “distinct” odor
of alcohol “emitting from [appellant’s] mouth.” Santuario further testified that, when
asked if he had been drinking, appellant “said he had mixed drinks, but he wasn’t
specific” as to the amount. 
          Santuario administered three field sobriety tests, beginning with the horizontal
gaze nystagmus (“HGN”) test, which checks for involuntary eye movement by
directing a subject to follow a light with his eyes. Santuario testified that he saw
involuntary eye movement. Two witnesses who were passengers in the car driven by
appellant testified that, while Santuario was giving the HGN test, appellant was
facing the lights of the downtown clubs. While he agreed with defense counsel that
the presence of blinking or flashing lights “messes up” the HGN test, Santuario
testified on cross-examination that appellant was “facing a blacked-out building,”
with his back to the clubs, at the time.
          Next, Santuario asked appellant to perform the one-leg stand test, which
requires the subject to hold the foot of his choice six inches off the ground, look at
it, and count “one thousand one, one thousand two,” and so on until instructed by the
officer to stop. Santuario testified that appellant “dropped his foot more than three
times,” which is “an indicator that he can’t perform the test.”
          Santuario then asked appellant to perform the walk-and-turn test, which
requires the subject to take nine steps heel to toe while counting out loud, then turn
180 degrees and repeat the process in the other direction. Santuario testified that “it
was hard for [appellant] to maintain his balance with the right foot in front of his left
foot,” that appellant “kept wanting to start before the procedure was fully explained
and demonstrated,” and that appellant counted ten steps in each direction instead of
nine. After the tests, Garcia and Santuario arrested appellant.
The Videotape
          At the police station, Officer Craig administered a second set of field sobriety
tests to appellant at the request of Santuario. The State introduced a videotape of the
tests into evidence. The first test on the videotape was the Rhomberg balance test,
which requires the subject to stand still with his head tilted back and his eyes closed
and count silently to 30. Craig testified that the test is designed to evaluate the
defendant’s “estimation of time” and that normal people are able to come within five
seconds of accurately gauging when 30 seconds have passed. Craig further explained
that officers are looking for a “circular sway” during the Rhomberg test. Craig
testified that appellant gauged 19 seconds as being 30 seconds and exhibited a
circular sway.
          Craig also administered the one-leg stand and walk-and-turn tests. Craig
testified that, on the one-leg stand, appellant “put his foot down at the very beginning
of the test and he also swayed.” On the walk-and-turn, appellant used his arms for
balance, stopped walking, stepped off the line, and made an improper turn. Craig
testified that he also noticed a “distinct odor of alcoholic beverage coming from about
[appellant’s] person.” Santuario testified that appellant would not provide a breath
sample at the police station, nor would he sign a statutory written warning form
outlining the consequences of refusing to do so. Appellant testified that he was
“thinking about doing the breath test” but that Santuario “snatched” the statutory
warning form from him while he was still reading it.
          The videotape introduced by the State also showed Craig asking appellant a
number of questions. Appellant’s trial testimony and his videotaped answers to
Craig’s questions were inconsistent in several respects. Appellant testified at trial that
he arrived at the Hilton Americas Hotel at “11:00, 12:00, around that area,” “got
appetizers,” and drank “no more than one” glass of wine before leaving. However,
on the videotape, appellant told Craig that he arrived at the hotel at 9:00, did not eat
there, and had one and a half drinks. On cross-examination, the prosecutor
highlighted those inconsistencies:
          [Prosecutor]: So, when did you get to the Hotel Americas?
 
          [Appellant]: When?
 
          [Prosecutor]: Yes.
 
          [Appellant]: 11:00, 12:00, around that area.
 
          [Prosecutor]: Where did 9:00 o’clock [sic] come from?
 
[Appellant]: I apologize. Again, I don’t recall exactly what time I got there. I
mean, when I go out, I just go, and I come home at 4:00 or 5:00 o’clock [sic]
in the morning. I don’t recall exactly.
          . . .
[Prosecutor]: Did you forget that you had appetizers when Officer Craig asked
you “yes” or “no”?
 
          [Appellant]: No, no.
 
[Prosecutor]: He did just ask you if you had anything to eat instead of have you
had a meal, correct?
 
          [Appellant]: If I recall right, yeah.
 . . .
[Prosecutor]: When Officer Craig asked you about the number of drinks, you
said, One and a half. Where did that extra half come from?
 
          [Appellant]: I really meant to say a half or a one, something like that.
            
          Appellant also testified that, had Santuario asked before administering the
HGN test if appellant had suffered any head trauma, he would have answered yes
because he has fallen and hit his head “[a]bout 10, 12 times” and has had
“convulsions where you just pass out and start shaking” since the age of two.
However, Craig asked appellant on the videotape if he had suffered any injuries in the
past, and appellant did not mention his convulsions:
[Prosecutor]: Now, Officer Craig also asked you if you had had any injuries,
correct?
 
[Appellant]: Craig is the one inside, when I was inside, yeah, I believe it was
on the video.
 
[Prosecutor]: And you forgot to mention that you have convulsions at that
time?

          [Appellant]: I mean—

          [Prosecutor]: “Yes” or “no”?
 
[Appellant]: No, I did not forget I had conclusions [sic]. I did not know what
concussion was exactly until [defense counsel] explained it to me.

The HGN Test 
          At trial, the following exchange occurred during the prosecutor’s direct
examination of Santuario:
[Prosecutor]: What are the causes of this involuntary jerking [of the eyes] when
you’re doing this [HGN] test?

          [Santuario]: The introduction of alcohol into the system.
 
[Prosecutor]: Can someone being tired or fatigued cause this jerking of the eye,
when you’re doing the test?

          [Santuario]: No, sir.

          [Prosecutor]: Is it only alcohol?

          [Santuario]: Yes.
 During an extensive cross-examination of Santuario, defense counsel
repeatedly emphasized that factors other than alcohol consumption can cause poor
performance on the HGN test:
[Defense counsel]: But before that test can even be properly administered,
there’s a certain number of required questions that have to be asked to make
sure that the person that is going to be given the test otherwise qualifies; isn’t
that true?

          [Santuario]: Yes, sir.
          . . .
[Defense counsel]: What are those prove-up, prequalifying questions that
have to be asked in every case?
 
[Santuario]: You ask if the person has ever had any type of head injuries or
any type of surgeries, which is one of the last few question [sic], if any. And
are they wearing contacts [sic] lenses or do they usually wear glasses.

          . . .
 
[Defense counsel]: If you did not prequalify him properly, that means the test
wasn’t done right, doesn’t it?

          [Santuario]: If I didn’t prequalify him, that’s correct.
 
[Defense counsel]: And, so, you wouldn’t want these six folks to rely upon the
results that you are now saying you came upon, would you?

          [Santuario]: To the best of my knowledge, it’s been administered correctly.
 
[Defense counsel]: And I appreciate those comments. My question was: You
wouldn’t want these six folks to rely upon that if the test was not properly
administered, would you?

          [Santuario]: If I did it improperly, that’s correct.

          . . .
 
[Defense counsel]: So, what you were trained to do is, in fact, bring the
stimulus [the light] out horizontal in a measure, and you are taught to take it
out to what is an average person’s 45-degree angle; isn’t that true?

          [Santuario]: Yes, sir.
 
[Defense counsel]: And what they have taught you is that an average person’s
45-degree angle would be somewhere near his shoulders; isn’t that true?
 
[Santuario]: Yes, sir. This being 90, then you have to split the pie and say
about right here.
 
[Defense counsel]: And that 45 degrees is going to be something that you
subjectively determine; isn’t that true?

          [Santuario]: Yes, sir.
 
[Defense counsel]: So, it’s kind of a—you have to kind of guess where that is,
don’t you?

          [Santuario]: Yes.
 
[Defense counsel]: There’s no science about it. It’s just a matter of doing your
best guess at the time?
 
[Santuario]: Right. It’s not like you get out—there’s a protractor on the guy
and say this is 45 degrees. It’s just impossible.
 
[Defense counsel]: And at the same time it’s brought out 45 degrees, it has to
be maintained between 12 inches and 15 inches away from the subject; doesn’t
it?

          [Santuario]: That’s correct.
 
[Defense counsel]: And if there’s any variance between the 12 and 15 or the
45 degrees, then you can’t be expected to rely upon those results, can you?

          [Santuario]: If there’s interference, that’s correct. 

          . . .
 
[Defense counsel]: One of the things that you are trained to look for with
respect to the horizontal gaze nystagmus test, in order for that test to be
properly administered, you cannot have in the background in someone’s
vision—or the subject’s vision blinking or flashing lights, can you?

          [Santuario]: Yes, sir, that’s correct.
 
[Defense counsel]: Because if there’s blinking or flashing lights, that’s another
reason why the results of the test would not—you wouldn’t want anybody to
rely upon them because it messes up the test?

          [Santuario]: That’s correct.

Motion for New Trial
          In his sole issue, appellant contends that the trial court erred in denying his
motion for new trial because the record shows that the State knowingly permitted
false testimony to be given. Specifically, appellant argues that Officer Santuario’s
answers to the prosecutor’s questions regarding the HGN test falsely indicated that
the only cause of involuntary movement of the eye during the administration of the
HGN test is “introduction of alcohol into the system.” At the hearing on appellant’s
motion for new trial, the State stipulated that involuntary eye movement has other
causes, and the State concedes in its brief that the testimony was false.
Standard of Review
           We review a trial court’s ruling denying a defendant’s motion for new trial
under an abuse of discretion standard. Rodriguez v. State, 191 S.W.3d 428, 453 (Tex.
App.—Corpus Christi 2006, pet. ref’d) (citing Salazar v. State, 38 S.W.3d 141, 148
(Tex. Crim. App. 2001)). We give almost total deference to the trial court’s
determination of the historical facts and of mixed questions of law and fact that turn
upon an evaluation of credibility and demeanor. Rodriguez, 191 S.W.3d at 453 (citing
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We review questions
of law, as well as mixed questions of law and fact that do not turn upon an evaluation
of credibility and demeanor, de novo. Rodriguez, 191 S.W.3d at 453 (citing Jennings
v. State, 107 S.W.3d 85, 89-90 (Tex. App.—San Antonio 2003, no pet.) (citing
Guzman, 955 S.W.2d at 89))). A trial court’s decision to deny a motion for new trial
will be sustained if it is correct on any theory of law applicable to the case.
Rodriguez, 191 S.W.3d at 453 (citing State v. Read, 965 S.W.2d 74, 77 (Tex.
App.—Austin 1998, no pet.)). False Testimony
          “The duty to correct known false evidence is not only a prosecutorial ethic, but
a constitutional requirement.” Duggan v. State, 778 S.W.2d 465, 468 (Tex. Crim.
App. 1989) (citing Mooney v. Holohan, 294 U.S.103, 55 S. Ct. 340 (1935)). It does
not matter whether the prosecutor actually knows that the evidence is false; it is
enough if the prosecutor should have recognized the misleading nature of the
evidence. Duggan, 778 S.W.2d at 468 (citing United States v. Agurs, 427 U.S.97,
103, 96 S. Ct. 2392 (1976)). Nor does it matter that the falsehood goes merely to an
issue of credibility, as the jury’s estimate of the truthfulness and reliability of a given
witness may well be determinative of guilt or innocence. Duggan, 778 S.W.2d at 469;
Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959).
          Generally, if a witness has testified to material, inculpatory facts against a
defendant and, after the verdict but before a motion for new trial has been ruled upon,
the witness makes an affidavit that he testified falsely, a new trial should be granted.



Yates v. State, 171 S.W.3d 215, 221 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d)
(citing Williams v. State, 375 S.W.2d 449, 451 (Tex. Crim. App. 1964)). There are
exceptions to this rule—such as when the recanting witness is an accomplice, the
recantation is found to be incredible in light of the evidence, or the recantation has
been coerced—but those exceptions do not apply in the instant case. Yates, 171
S.W.3d at 221 (citing Villarreal v. State, 788 S.W.2d 672, 674 (Tex. App.—Corpus
Christi 1990, pet. ref’d)). Noting that this rule does not require that the State have
knowledge that the testimony was false, we review the record to determine whether
the State used the false testimony and, if so, whether there is a reasonable likelihood
that the false testimony could have affected the judgment of the jury. Yates, 171
S.W.3d at 221 (citing Ramirez v. State, 96 S.W.3d 386, 394-95 (Tex. App.—Austin
2002, pet. ref’d)).
Use
          The State contends that it did not “use” Officer Santuario’s testimony because
it “merely asked one time whether alcohol was the only cause” of involuntary eye
jerking and “never argued [in closing argument]” that involuntary eye jerking
“showed that the appellant had alcohol in his system.” We disagree. Uncorrected false
evidence may be “used” by the State even if the defendant elicits the evidence on
cross-examination. See Duggan, 778 S.W.2d at 467-68 (“Because some sort of
understanding between the State and the accomplices did indeed exist, the
accomplices’ firm, sweeping assertions [on cross-examination] that no such
agreements existed lent a false impression to the court. . . . Given the prosecutor’s
post-trial admissions, the true nature of the relationship between the accomplices and
the prosecution was misrepresented to the jury.”). Certainly, uncorrected false
testimony given during a direct examination by the State is “used,” regardless of how
many questions were asked or whether the State refers to the evidence during its
closing argument. We conclude that the State “used” Officer Santuario’s testimony.
Materiality
          Violation of the prohibition against the use of false testimony demands that a
conviction be set aside or rendered invalid if there is a reasonable likelihood that the
false testimony could have affected the judgment of the jury. Ramirez, 96 S.W.3d at
396.
          We conclude that there is no such likelihood in the instant case. The record
contains abundant evidence apart from the complained-of testimony that any
involuntary eye movement during the HGN test was attributable to alcohol in
appellant’s system. Appellant admitted to drinking alcohol, and the State prosecuted
on the theory that appellant stayed longer at the hotel, ate less, and consumed more
alcohol than he told the jury at trial. In support of that theory, the State introduced not
only testimony regarding the HGN test but the police station videotape, on which
appellant contradicted his trial testimony and performed poorly on three field sobriety
tests, none of which was the HGN test; Craig’s testimony discussing the videotape;
Santuario’s testimony that appellant admitted to drinking an unspecified number of
“mixed drinks” when he was arrested, smelled of alcohol, performed poorly on two
field sobriety tests apart from the HGN test, acted in a belligerent manner, and refused
to provide a breath sample; and Craig’s testimony that appellant smelled of alcohol.           Further, during a lengthy cross-examination, Santuario acknowledged
numerous factors unrelated to alcohol consumption that can affect the results of the
test. Therefore, through his cross-examination of Santuario, appellant was able to
establish that the HGN test is not infallible.
          Appellant urges us to follow the harmless error analysis of Schultz v. State, an
appellate case from Maryland in which the court reversed a conviction for driving
under the influence. 664 A.2d 60 (Md. Ct. Spec. App. 1995). In prosecuting the
defendant, the State of Maryland relied heavily on the testimony of the arresting
officer—who was the State’s only witness—that the defendant showed involuntary
eye movement during the HGN test. Id. at 61. The court held that the HGN evidence
was inadmissible because no predicate had been laid establishing that the test was
reliably conducted or that the officer was qualified to administer it. Id. at 179-180.
Schultz is distinguishable because the defendant in that case denied drinking alcohol
and the HGN test was the primary evidence against him.
          Although we disapprove of the prosecutor’s failure to correct Santuario’s
testimony, we conclude that there is no reasonable likelihood that the false testimony
could have affected the judgment of the jury. Accordingly, we hold that the trial court
did not err in denying appellant’s motion for new trial and overrule appellant’s sole
point of error. See, e.g., Frank v. State, 183 S.W.3d 63, 71 (Tex. App.—Fort Worth
2005, pet. ref’d) (“Ebert’s false testimony only concerned who picked up the brick.
It did not negate the evidence that Frank nevertheless used a piece of that brick to
strike Tacina on the head, causing her serious injury. . . . Because the record before
us does not establish that Ebert’s new testimony would probably bring about a
different result, we hold that the trial court did not abuse its discretion by permitting
Frank's motion for new trial to be overruled by operation of law.”); Crenshaw v.
State, No. 13-00-692-CR, 2002 WL 34249771, at *6 (Tex. App.—Corpus Christi
May 23, 2002, pet. ref’d) (mem. op., not designated for publication) (“[A]ppellant
argues that the trial court erred by denying his motion for new trial after learning that
Damon Sahadi and Detective Ralph Lee had supplied false testimony. . . . These
conflicts are not so serious that they require a new trial.”); Sandoval v. State, No. 10-08-00070-CR, 2008 WL 4816610, at *4-5 (Tex. App.—Waco Nov. 5, 2008, no pet.)
(mem. op., not designated for publication) (“Even assuming that the State was aware
of or should have been aware of the error and refused to correct it, . . . we cannot say
that the trial court abused its discretion by denying Sandoval’s motion for new
trial.”); Gutierrez v. State, No. 13-06-00132-CR, 2008 WL 4182446, at *3 (Tex.
App.—Corpus Christi June 19, 2008, pet. dism’d) (mem. op., not designated for
publication) (affirming denial of motion for new trial; “[A]ppellant does not explain
how any inconsistency mentioned by S.B. could have affected the course or outcome
of the trial. . . . Appellant has simply failed to show that the State knowingly elicited
false testimony or that the false testimony could have affected the ultimate judgment
of the jury.”); see also Johnson v. State, No. 05-06-01310-CR, 2008 WL 1799744,
at *4 (Tex. App.—Dallas April 22, 2008, pet. ref’d) (mem. op., not designated for
publication) (due process challenge; “[W]e are convinced beyond a reasonable doubt
Carroll’s testimony that he did not know the men who robbed him did not contribute
to appellant’s conviction or punishment. . . . Thus, we conclude appellant’s argument
that his due process rights were violated by the State’s use of false testimony at trial
lacks merit.”). 
Conclusion
          We affirm the judgment of the trial court.


                                                             George C. Hanks, Jr.
                                                             Justice

Panel consists of Chief Justice Radack and Justices Alcala and Hanks

Do not publish. Tex. R. App. P. 47.2(b).